## DORR E. FELT et al.

### v.

## JOHN P. BELL.

*Opinion filed October 26, 1903—Rehearing denied December 3, 1903.*

1. FRAUD—*fact that a person defrauded proceeded willingly is no defense.* It is no defense to an action to rescind a sale of property for fraud that the person defrauded proceeded willingly, and believed, after investigation, that the price he paid for the property was reasonable.

2. SAME—*when existence of fiduciary relation need not be shown.* If the vendor of certain patent rights knowingly aids one of the joint purchasers to defraud his partner into paying for a one-third interest more than the agreed price for the whole interest, it is not necessary to show a fiduciary relation between the vendor and the defrauded party in order to make his conduct fraudulent as to him.

3. SAME—*knowledge of fraud is essential to a ratification.* In order to establish a ratification of a fraudulent transaction it must be shown that the defrauded party had knowledge of the fraud; and it is not sufficient to show that he suspected fraud, and had sought to bring the parties to settlement by threatening legal proceedings two years before he filed his bill to rescind the transaction.

4. SAME—*effect as to rescission where parties join in fraud.* If the vendor of certain patent rights joins with one of the purchasers to defraud the latter's co-partner into paying for a one-third interest the consideration for the entire interest, the fact that the defrauded partner cannot restore the two-thirds interest acquired by the other partner does not defeat his right to a rescission.

5. SAME—*what not a defense to rescission.* That the purchaser of certain foreign rights under a patent has allowed the same to lapse by failing to pay taxes is no defense to his right to a rescission on the ground of fraud, where the defendants, knowing of the fraud and that it must sooner or later be discovered, could have protected themselves by paying such taxes.

6. SAME—*when relation of agency is no defense to fraud.* That one partner acts as agent for the other in negotiating the purchase of certain foreign rights under a patent is no defense to the right of the latter to rescind the transaction for fraud committed upon him, as the result of the joint fraud of his partner and the vendor.

7. INTEREST—*interest is recoverable on rescission of a sale for fraud.* Where a sale is set aside upon the ground of fraud, interest is allowable from the time the transaction was rescinded.

*Bell* v. *Felt,* 102 Ill. App. 218, modified and affirmed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

The defendant Dorr E. Felt obtained from the United States letters patent in the year 1888 for an invention known as a "comptometer." Felt associated with him in business the defendant Robert Tarrant, and thereafter a corporation was organized known as the Felt & Tarrant Manufacturing Company. Subsequently patents for this machine were granted by the republic of France and the kingdom of Belgium to Felt and Tarrant and the Felt & Tarrant Manufacturing Company. About the beginning of May, 1891, the complainant, John P. Bell, met the defendant Parker R. Mason. Bell at this time stated to Mason that he was looking for something to get into, whereupon Mason asked him if he (Mason) could mention a good thing in which there was money, would he (Bell) go into it, to which Bell replied, "I would like to find out what it is." Thereupon an appointment was made, and the next day Bell and Mason went to the place of business of the defendant company and examined the machine. Bell and Mason, within the space of two weeks, went to the office of the Felt & Tarrant Manufacturing Company a number of times, something like, as Bell testifies, half a dozen; and Mason, Bell not being present, made an arrangement with Felt and Tarrant and the Felt & Tarrant Manufacturing Company for a sale to them, Mason and Bell, of the French and Belgium patents for the sum of $7000. Mason reported to Bell that he had arranged for the purchase of these patents for $25,000, one-third interest to be conveyed to Bell for one-third of this sum and a two-thirds interest to be conveyed to Mason for two-thirds of $25,000. Bell testifies that Tarrant and Felt, before the transfer was made, each told him that the price agreed upon was $25,000.

Tarrant and Felt deny this, and each for himself declares that he never had any conversation with Bell as to the price to be paid for the patents, but that the arrangement was made with Mason alone, and was for the sum of $7000.

On the 15th of May, Mason, Bell, DeBerard and Felt met by agreement in the office of the Commercial Safety Deposit Company, in whose vaults Bell had money. At this meeting assignments of two patents by the Felt & Tarrant Manufacturing Company and of two by Felt and Tarrant were made to Mason and Bell. Each of the assignments conveyed to Bell an undivided one-third interest of the patents and to Mason an undivided two-thirds of the same patents. Two of the assignments were each for the therein expressed consideration of $5000, making in all an expressed consideration of $30,000. This sum Tarrant and Felt say was inserted in the assignments at the instance of Mason, who stated that the assignments were to be used in Europe, and he wished to have the entire consideration expressed therein $30,000. Upon this morning of May 15, these four parties, Felt, DeBerard, Mason and Bell, met at the office of the Felt & Tarrant Manufacturing Company and went from there to the Commercial safety deposit vaults. Before leaving the office of the company Bell executed a note payable to it for $1333.33, which he left with DeBerard, the secretary and book-keeper of the company. Bell testified: "Felt handed me the papers all in a large envelope, and we started out and walked over from Tarrant's place of business to the deposit vaults. After a few moments' conversation in regard to the money, I went into the vault and got out $7000 in bills of $1000 each, and before I paid my money over Mason pulled out some money and paid it over to DeBerard. He also handed me over some papers. I wanted to see what the papers were, but DeBerard said, 'That is all right; they are all straight and right; they have been looked over,' and he would not

show them to me. Before I paid my money over, 'Now,' says I, 'gentlemen, is this straight—is this right?' 'Yes,' says DeBerard. I counted out the seven thousand dollar bills and I spoke about a receipt. 'Well,' he says, 'the acknowledgment is stated already in the papers; if we have to give you another receipt we will have to change those papers.' Of course, I, knowing all the men being named in the papers, took it for granted that it was all right, and after that we left the office of the safety deposit vaults together and walked to the corner of Dearborn and Monroe streets. We separated there. I went north; the other three, Mason, Felt and DeBerard, went south." Bell received at this time the assignments of the patents and some other papers, which he was told pertained to the same thing.

DeBerard and Felt deny the testimony of Bell as to questions at that time asked by him to the effect if everything was right and straight, and the answers he says were thereto made. DeBerard testifies that he drew the assignments in accordance with directions given to him by Mason; that he did at the time of the transfer receive from Bell $7000 in cash and his note for $1333.33; that prior to this time Felt had told him that he had agreed to accept $7000 for the assignment; that at the time of the assignment he received from Mason $900 in cash and his check for the difference between that sum and $16,-666.67; that two or three days afterwards he returned to Mason the check he had received from him and also the $900 he had received from him; that the $7000 received from Bell was kept and paid into the company on Tarrant's account; that the total consideration received for all the assignments made by Felt and Tarrant, and by the Felt & Tarrant Manufacturing Company, was $7000 and the Bell note; that at the time of this meeting, May 15, 1891, when the assignments were delivered, nothing was said to the effect that the company would return to Mason the consideration he paid over in the presence of

Bell on that date, and that the matter was never, so far as he (DeBerard) knows, brought to the attention of Bell in any way; that Felt and Mason fixed the consideration that was to be mentioned and was mentioned in the assignments; that prior to the meeting at the safety deposit vaults there had never been any arrangement with Mason that they were to receive from him the money or check which he handed over, nor any talk that Tarrant and Felt, or the company, or all together, were to get more than $7000 on the delivery of the assignments; that a few days thereafter Mason came to him (DeBerard) and said, "I want my check and my money back," and that he (DeBerard) thereupon gave the money and check given by Mason back to him; that he did this because he understood "we were entitled to $7000 only;" that they went to one of the Commercial vaults on that day and expected to receive $7000 only, altogether; that he was surprised at receiving a note for thirteen hundred odd dollars and a check for some $16,000, and $900 in excess of the $7000 which it had been agreed the assignment should be made for; that he did not offer to return the $900 or either of the notes so given to him; that he was not instructed by the other members of the company to return the money or check given by Mason, but did so on his own motion, and never had any conversation with either member of the company in regard to returning it; that there was really no consideration for the note for $1333.33 given by Bell; that the company still had that note, and in open court offered to return it to the complainant, Bell. DeBerard testified that he was surprised at receiving the note given by Bell, but that he did not give any expression to his surprise, because he thought the matter was between Bell and Mason and he was not interested, and he "just kept quiet, and that is all."

That Mason did, in the presence of Bell, at the time this assignment was made, hand over $900 in money and his check for $16,666.67, less the $900, and that a day or

two afterwards the same were returned to Mason, and that the price agreed upon for the transfer of the assignments was $7000 and no more, was not denied upon the hearing of the case and is not now. Mason in his last illness testified that he did pay for the assignment two-thirds of $25,000, all in cash, except his note for $2000, which note he afterwards paid, and that he received nothing back. Neither Felt, nor Tarrant, nor DeBerard, nor any one, corroborated Mason in this regard.

Mason had talked with Bell, the complainant, about his (Mason's) going to Europe to dispose of the French and Belgium patents, but as time ran on and he failed to do so and nothing came from the assignments, Bell began to be suspicious and made inquiries concerning Mason's financial condition at the time of the assignments, and came to doubt whether Mason had actually paid over two-thirds of the $25,000 he (Bell) understood the price of the transfer to him and Mason made. There was some talk on the part of Mason with Felt and Tarrant, and also on the part of Bell, that they should give to the Felt & Tarrant Manufacturing Company an option for a certain time to purchase, or a price at which the company might sell, the French and Belgium patents. Felt, during the negotiations for such option, went to Bell's house and told him he had an option on Mason's interest in those patents and wanted an option on his (Bell's) interest, and if he (Bell) would give him (Felt) an option for six months, he (Felt) would give Bell his note, and that if he took the patents within six months he would pay him (Bell) $7000, to which Bell replied that he wanted his money down right then and there before he would sign any option or do anything.

During the trial testimony as to the laws of France and Belgium was introduced, from which it appears that a yearly tax has to be paid in each country upon patents issued thereby, and that it is necessary that the patents should be worked,—that is, that if the patentee during

two successive years ceases to work his patent it will be forfeited, unless in some way he justifies his inaction, and that a failure to pay taxes will cause a forfeiture of the patent. Bell, through the Felt & Tarrant Manufacturing Company, paid taxes for two years. Mason testified that he paid the taxes up to 1897 or 1898. On cross-examination he was uncertain whether he paid them more than for six or seven years after he purchased; finally, he thought it was about six years that he paid them. There was no evidence that either the French or Belgium government had taken any steps towards the forfeiture of any of these patents. It was admitted that no taxes had been paid since the beginning of the present suit, the bill in which was filed May 13, 1896.

May 15, 1894, the complainant's attorney, Mr. Wilbur, wrote to Mr. Tarrant to the effect that unless some settlement was made with Bell, a suit to set aside the assignment on account of fraud, and for the return to Bell of the money paid by him, would be commenced. Bell testified that until he heard the testimony of DeBerard upon the hearing of this case he did not know what fraud had been practiced upon him, or that Mason had not paid for the assignments the sum of money it was understood by him (Bell) he (Mason) was to pay; that in fact he had long suspected this, but had never known it until he listened to the testimony of DeBerard in this case.

The bill in this suit was filed in 1896. From a judgment of the trial court dismissing the bill for want of equity an appeal was taken to the Appellate Court for the First District, where the decree of the lower court was reversed and the cause was remanded to the superior court, with directions to enter a decree against appellants for $7000, and a decree that the assignment of the patents to Bell and Mason be set aside and the note of appellee be set aside and held for naught. The case comes here by further appeal.

D. J. & D. J. SCHUYLER, Jr., for appellants.

WILLIAM P. BLACK, and GEORGE W. WILBUR, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

The record in this case discloses a transaction which is palpably fraudulent. Bell was induced, by false representations of Mason as to the contract price, to part with $7000 in money and his note for $1333.33 for a one-third interest in patent rights, although the vendors had placed a valuation of only $7000 upon the entire interest. It is no defense to the allegation of fraud to contend that Bell was willing to pay $8333.33 for a one-third interest and that he actually obtained that interest for the amount paid, for if we concede that he obtained the very thing he expected to obtain, and paid no more therefor than he, after investigation, had concluded was reasonable, it does not follow that he was not grossly imposed upon. (*Veazie* v. *Williams*, 8 How. 134; *Pendergast* v. *Reed*, 29 Md. 398; 96 Am. Dec. 539.) He would not have paid $8333.33 for a one-third interest if he had known that the entire property was to be purchased for $7000, and that Mason was to profit by the transaction to the extent of receiving a two-thirds interest without any expense whatever. Mason represented as a fact—not as an opinion—that the valuation and price fixed upon the patent rights were $25,000. By this deception Bell was induced to part with a greater sum of money for a one-third interest than the vendors asked for the entire interest. He was misled by the false misrepresentations of Mason,—representations which were made to deceive him and which did deceive him. An unconscionable advantage was taken, which it is within the sphere of equity to remedy. If, therefore, the record shows that the defendants are in any way implicated in the fraud by active procurance or deceptive conduct, and if it can be

further shown that no rule of equity will be contravened, there will be a clear case for the applicaton of the equitable remedy of rescission.  *Cortes Co.* v. *Tannhauser*, 45 Fed. Rep. 730; *Yeoman* v. *Lasley*, 40 Ohio St. 190.

It is next to be determined whether or not defendants Felt and Tarrant and the Felt & Tarrant Manufacturing Company have become implicated in this fraudulent scheme executed by Mason.   Bell swears that before the sale was made Felt and Tarrant each told him that the contract price was $25,000.   Felt and Tarrant deny this. Each one swears that he had no conversation with Bell relative to the price of the patent rights, but that all their negotiations were with Mason, and that they fixed the price to him at $7000.   It is not necessary to weigh this testimony, for the record shows, we think, that De-Berard, the agent of the defendants Felt and Tarrant and the Felt & Tarrant Manufacturing Company, while within the scope of his authority, was an active participant in the fraud, and that said defendants have adopted the benefits of the transaction.   Therefore, whether it was with or without their knowledge, the defendants are subject to equitable action.   DeBerard, the financial agent of the defendant company, drew the assignments in accordance with the directions given by Mason.   On the 15th of May, 1891, he went to the vaults of the Commercial Safety Deposit Company with Felt, Mason and Bell.   The assignments were transferred, and DeBerard received from Bell $7000 in cash and his note for $1333.33, and from Mason he received $900 cash and his check for $15,766.67, making the entire consideration received $25,000.   A few days after this Mason went to DeBerard and demanded his money back.   DeBerard thereupon delivered to him the $900 cash and the check for $15,766.67. He retained the $7000 and the note for $1333.33.   DeBerard attempts to explain his attitude by saying that he understood at the time that the consideration was to be $7000; that he was surprised to receive the note from

Bell and the money from Mason, but that he thought the matter was between Bell and Mason, and he "just kept quiet, and that is all." We cannot believe that was all. Even if the matter were between Mason and Bell, there was a surplus of $18,000 being paid to him. Is it possible that a man will innocently receive $18,000, for which there is absolutely no consideration, and fail to manifest some surprise? Even if he had not known of this scheme before, being a man of financial experience he must have known that such a proceeding was colorable.

We are considering this transaction in a light most favorable to defendants. These conclusions are drawn from the testimony of DeBerard alone. Bell's testimony tends to make DeBerard's conduct much more culpable; but we may disregard his testimony and still find sufficient evidence to make it clear that DeBerard, by affirmative acts, made himself a party to the fraudulent scheme. Let us consider his subsequent conduct. Take, for instance, DeBerard's own version of his attitude. He did not know of the fraud. He understood the consideration to be $7000, and was surprised to receive $18,000 in excess of that, but kept quiet because it was a matter between Bell and Mason. Mason came several days later and demanded his money and check, and DeBerard unhesitatingly returned them. That is to say, knowing that there were two joint purchasers, and knowing that one was to receive a two-thirds interest and the other a one-third interest in the patent rights, he returned to the one who was to receive the greater interest the entire amount he had paid. If he had been innocent, would he have kept all the consideration from one joint purchaser and returned all that the other had paid? Moreover, not only did he make the $7000 cash given by Bell pay for the entire patent interest, but he kept the note made by Bell for $1333.33, and one of the objects of this suit is to enjoin the negotiation of that note. Later on we see the defendant company, through Felt, one of the firm and

company, offering to surrender this note to Bell as part
of the consideration for a proposed purchase of Bell's
interest in the patent rights. This evidence, and the in-
ferences deducible from it, show clearly that DeBerard
had guilty knowledge of the fraud practiced by Mason,
and that to assist in its perpetration he lulled the com-
plainant into security by going through the form of re-
ceiving from Mason the sum of $16,666.67, being Mason's
two-thirds of the purchase price. The law does not per-
mit one in this manner to assist in cheating another.
(*Beidler* v. *Crane*, 135 Ill. 92.) It is not necessary for the
purpose of making DeBerard's conduct fraudulent, to
show that there was a fiduciary relation between him
and Bell. It is sufficient that Mason and Bell, with the
knowledge of DeBerard and the company, were about
to enter into the relation of co-purchasers, and that this
was a fiduciary relation. *Bunn* v. *Schnellbacher*, 163 Ill.
328; *Cortes Co.* v. *Tannhauser*, *supra*.

It is undoubtedly true that Mason committed a fraud,
and it is just as clear to us that DeBerard assisted af-
firmatively in its commission. This being the case, we
need not attempt to show that Mason was actually the
agent of the defendants in this transaction, or that his
commission for the sale was to be a two-thirds interest,
for which he was ostensibly to pay $16,666.67 and actu-
ally paid not one cent. Nor does it affect this conclu-
sion to admit, as the appellants urge, that Mason was
Bell's agent. We recognize the general rule that notice
to the agent is notice to the principal; but it would
be, indeed, a novel doctrine if we should hold that if an
agent has knowledge that he is defrauding the princi-
pal, the principal cannot have a remedy, for the reason
that, being charged with the knowledge of his agent in
the fraud, he was a guilty party in the plot to defraud
himself. From DeBerard's own testimony we conclude,
without hesitancy, that he assisted in the perpetration
of the fraud by his sham conduct, and this being so, all

arguments, however logical in themselves, which rely upon this doctrine of agency as a defense, are specious, because based upon the premise that DeBerard was entirely innocent. We conclude, therefore, that the defendants, through their agent, are guilty of fraud. *Fitzsimmons* v. *Joslin*, 21 Vt. 129; 52 Am. Dec. 46.

If there has been no ratification and if the parties can be put *in statu quo*, or, this being impossible, there is some equitable excuse for the inability to do so, this complainant is clearly in a position to invoke the aid of equity in the restoration of his rights. The question of ratification is easily disposed of. There is no evidence whatever to show that the complainant ever had any knowledge that fraud was committed until the time of the trial. Mason swore, even on his death-bed, that the transaction was *bona fide* and that he actually paid $16,666.67 for his two-thirds interest in the patent rights. The defendants, in their answer to the bill, say that the actual consideration was $25,000. Under such circumstances it is not difficult to believe that complainant had no knowledge of the fraud until the time of the trial. It is true that he had been suspicious, but suspicion is not knowledge. (*Warren* v. *Tyler*, 81 Ill. 15.) Of what avail would an inquiry growing out of suspicion have been, if Mason would swear on his death-bed that the actual consideration was $25,000 and if these defendants would state in their answer that the actual purchase price was $25,000? It is not surprising that it required a long time for the complainant to establish his case. The defendants urge that because complainant's solicitor, Wilbur, wrote a letter to the defendants two years before filing the bill, in which he threatened a suit on the ground of fraud, there was knowledge of the commission of the fraud, and that a delay of two years thereafter was a ratification. Wilbur swears that when he wrote that letter he had no positive knowledge of fraud, but that he had looked into Mason's financial standing and concluded

that it was improbable that a man without greater means would pay $16,666.67 for patent rights and then not prosecute the enterprise in which he had so much money. We think the testimony of this witness was entirely satisfactory. He, as he said, wrote that letter on a "big, cold guess," thinking thereby to bring the defendants to a settlement. He suspected fraud, but knew that all proof of it must come from the other side. There is no evidence of ratification, because there is no evidence that complainant had knowledge before the bill was filed.

The principal defense of the appellants is, that equity will not rescind the contract because the parties cannot be placed *in statu quo.* It is insisted that the parties can not be restored to their original position, because, first, complainant having only an undivided one-third interest in the patent rights could not return the entire interest to them; and second, complainant having failed to pay certain annuities which were required by the French law, had allowed the patent rights to be forfeited.

As to the first point little need be said. Complainant paid $7000 in cash and his note for $1333.33 for a one-third interest. DeBerard knew that this entire amount came from Bell, because he returned all that Mason had paid. The defendants are therefore in no position to say that complainant cannot rescind the contract as to his one-third interest. If DeBerard saw fit, in the transaction, to make Bell pay $8333.33 for his one-third interest and make a gift to Mason of the other two-thirds interest, it is certainly not the fault of this complainant that a rescission would leave these defendants without compensation for this two-thirds interest. (*Hegenmyer* v. *Marks,* 37 Minn. 6; 5 Am. St. Rep. 808.) Mason and DeBerard were united in the fraud, and where such a condition exists a court of equity will not refuse a remedy to an innocent party for the mere reason that one of the guilty parties does not release to the other some advantage gained in the transaction. As this court has said

205—15

before: "Where parties unite in a fraud, they have no
such standing in a court of equity as will require that
court to adjust nicely the equities between them when
their fraudulent transactions are set aside." *Vandyke* v.
*Walters*, 88 Ill. 444.

The second point, as to the *status quo*, made by the
appellants is, that the patents being forfeited under the
French laws complainant is able to deliver back only
the worthless paper. The evidence on this point is con-
flicting. Mason swore that the taxes were paid up to
1897 or 1898. Bell, the complainant, swears that he paid
them two or three years and that after that Mason paid
them. He was asked to state how he knew that Mason
paid them, and he answered that Mason told him so.
Felt swears that they were paid up to 1893 through him,
but after that he has no knowledge whether they were
paid or not. It is true that Mason's testimony in one
respect has been proven to be false; yet it must be re-
membered that when he swore that he actually paid two-
thirds of the $25,000 for his interest in the patent rights
he had a strong motive for such a falsehood. That was
his defense. He was presumably relying upon it to de-
feat this suit. These defendants in their answer set up
the same defense. It is not difficult to understand why
he would forswear himself as to this fraudulent transac-
tion. The payment of annuities, however, was no matter
of defense. He had no reason to swear falsely with ref-
erence to them. It did not strengthen him in his defense
to swear that he paid the taxes up to 1896, 1897 or 1898,
and it would not have made his position weaker to have
sworn that he discontinued payment in 1893 or 1894. We
have, then, Mason's testimony that the taxes were paid
up to the time the bill was filed. No one swears that
they were not paid to that time. This being the case,
this court can only conclude that up to the filing of the
bill in this case the annuities required by the French gov-
ernment were paid.

Testimony is introduced showing that in France the patentee "shall forfeit his rights who does not work the patent within two years under the date of the signature of his patent, or who has ceased to work it during two consecutive years, unless in one or the other case he justifies himself in the causes of his inaction." For the purposes of argument we shall not question this law or its method of introduction in evidence. Under it the patent rights which Bell purchased lapsed in 1893, according to appellants' contention, yet on September 24, 1894, we find the defendants offering him $7000 cash and his note for $1333.33 for his interest. If forfeited patent rights were then as valuable as that, we can presume that they are still as valuable. On the whole, then, we believe that even if the burden were upon the complainant (as to that we do not decide) to show that at the time the bill was filed he could have put the parties *in statu quo*, he has done so. Moreover, granting that the rights did lapse in 1893 and became absolutely worthless, the defendants had notice at that time, from Wilbur's letter, that fraud was suspected and full knowledge that fraud had been committed, and if they had cared to protect the patent rights they could have paid the annuities from that time. It is true, the letter was a mere conjecture on the part of Wilbur; yet it contained an accusation of fraud, and if the defendants surmised that it was a conjecture they must have thought it a good one. The defendants knew, either actually or through their agent, DeBerard, (and we think, both,) that fraud had been committed, and when receiving this letter they could easily have protected themselves by paying the annuities. They must have known, on the receipt of this letter, that sooner or later Bell would discover enough facts concerning the fraud to warrant him in bringing a suit to rescind. Having this opportunity to protect themselves, they are in no position now to resist an equitable remedy upon the alleged ground that the patent rights have lapsed.

This case stands upon its own peculiar facts and no case can be found parallel or closely analogous to it. The fraudulent scheme, the subject matter, the astonishing difference in the nature of the defense relied upon in the answer and upon the trial,—these are all unique and peculiar features. There is difficulty in applying the law to the facts, and although the proofs are not altogether satisfactory, yet they are such as to show conclusively that a fraud was perpetrated by Mason and that DeBerard assisted in its commission. In the absence of all other proof we think the question of *status quo* could be decided from two portions of the evidence, to-wit: the evidence that unworked patents lapsed in two years, and the letter from Felt and Tarrant to Bell on September 24, 1894, in which they offer him $7000 and the surrender of his note for $1333.33 for his interest in the patent rights. What are the inferences to be drawn from the fact that the defendants offered such a large price for patents that had lapsed a year previous? Either that the law was not correctly given at the trial, or that Felt and Tarrant were willing to pay more for a one-third interest in patent rights lapsed in France but still good in Belgium, than they had asked for the entire interest in such rights before they had lapsed. We must assume that the law was given correctly, because it was introduced by these defendants. The alternative is, that defendants consider lapsed patent rights a valuable property, and if they do, we cannot improve upon the valuation that these defendants have placed upon them in the letter mentioned.

The only basis for the requirement that there must be a restoration to the *status quo* before equity will permit a rescission of the contract is in the maxim of equity that "he who seeks equity must do equity." (*Mason* v. *Bovet*, 1 Denio, 69; 43 Am. Dec. 651.) Equity does not strive to save the perpetrator of the fraud from any harm. (*Brown* v. *Norman*, 65 Miss. 369; 7 Am. St. Rep. 663.) It does, however, stand for the principle that no

party may successfully invoke the aid of equity for the rescission of a contract unless he is willing to restore the other party to the position he enjoyed at the time the contract was made. (*Neblett* v. *Macfarland*, 92 U. S. 105.) This complainant offers to give up the assignment of the patent rights. If it were conceded that these rights have lapsed in France but not in Belgium, we could still look upon the rights as property for which the defendants were willing, and presumably are still willing, to pay a great price.

The appellee assigns as cross-error that the Appellate Court erred in not having directed the allowance of interest on the $7000 from the time it was paid by appellee to appellants, on May 15, 1891. Appellants contend that such interest should not be allowed, for the reason that the statute which provides for the allowance of interest does not include such a condition as this, citing *Fowler* v. *Harts*, 149 Ill. 592. In that case the court says (p. 597): "At the common law interest was recoverable in no case except where there was an express agreement to pay it, and in this State the rule seems to be well settled that it cannot be recovered except where the statute authorizes it, and interest may therefore be regarded as dependent upon and the creature of the statute." In *Sammis* v. *Clark*, 13 Ill. 544, it was held that in this State, in actions purely *ex contractu* and where there is nothing tortious in the character of the indebtedness, interest can only be recovered in the cases specified in the statute or where there has been an express or implied promise to pay interest. But this case is not an *ex contractu* action free from a tortious aspect. It is a suit to rescind on the ground of fraud. In *Warren* v. *Tyler*, 81 Ill. 15, it was held that where a party rescinds a contract whereby he is induced, through fraudulent representations, to accept unimproved lands in settlement of a debt, he will be entitled to interest from the time of such fraudulent transaction, and will not be restricted to the time when

he rescinded. (*Steere* v. *Hoagland,* 50 Ill. 377; *Horne* v. *Walton,* 117 id. 130; *Deimel* v. *Brown,* 136 id. 586; *Veazie* v. *Williams, supra.*) We are of opinion appellee should recover interest from the date of filing his bill in this cause, May 13, 1896, which was the time of the actual rescission of said contract by him. The decree of the Appellate Court will therefore be modified to include interest, at the rate of five per cent on $7000, from May 13, 1896.

The decree, with the above modification, will be affirmed.

*Decree modified and affirmed.*