(No. 24389.

HERMAN N. BUNDESEN, Appellee, *vs.* A. A. LEWIS *et al.* Appellants.

*Opinion filed April 15, 1938—Rehearing denied June 8, 1938.*

KINNE, SCOVEL, ROBSON & MURPHY, EDWARD M. HER-MAN, CASTLE, WILLIAMS & McCARTHY, and MARSHALL SOLBERG, (KELLAM FOSTER, HARRY C. KINNE, FRANZ W. CASTLE, and GEORGE R. LYON, of counsel,) for appellants.

MAX MURDOCK, for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellee, Herman N. Bundesen, filed his third amended complaint in the superior court of Cook county on June 17, 1929, against A. A. Lewis, Melvena Wilson, Peter A.

Karambelas, Jacob Schwartz, Michael Baumann, Moses P. Kaplan, and others, seeking the cancellation of thirteen contracts to purchase real estate therein described, for an accounting and for the return of the price of the real estate paid, that such payments be decreed a lien on the real estate, and that such lien be foreclosed and the premises sold to satisfy it. The complaint also sought to enjoin the defendants from forfeiting complainant's interest in the contracts and for other relief.

Karambelas and Schwartz answered, admitting all the allegations of the bill. The answer of Schwartz was in the nature of a cross-bill seeking affirmative relief against the other defendants of the same character as prayed in the original bill. All other defendants answered, denying the allegations of fraud and misrepresentations. The cause was referred to a master, who took the evidence and filed his report recommending that a decree be entered in accordance with the prayer of the third amended bill and the answer and cross-bill of the defendant Schwartz. The chancellor sustained exceptions to the master's report and entered a decree finding no actionable fraud had been proved, and dismissed the complaint and cross-complaint. On appeal to the Appellate Court, this decree was reversed except as to the dismissal of Schwartz's cross-complaint, and the cause as to all other parties was remanded with directions. The cause is now before this court on leave to appeal granted. Schwartz did not seek review here and as to him the case is closed.

Much evidence was taken. From an analysis of it we are of the opinion that its greater weight tends to establish the following facts: In the month of March, 1925, Karambelas, a brother-in-law of appellee, and theretofore a restaurant keeper, but who also had assisted the defendant Kaplan in the sale of some lots in Chicago, was requested by defendants Kaplan, Lewis and Miller, to sell lots in a new subdivision which Lewis said he was going to place on the

market soon. Karambelas obtained a broker's license and was furnished office room with Kaplan and Miller, connected with the A. A. Lewis Realty Association. This association was a co-partnership consisting of defendants Lewis and Wilson. During the following month Karambelas made a personal inspection of the property which included the sixteen lots here involved. It had been surveyed and platted, though at that time was in use as a truck-farm.

Appellee's principal witness was the defendant Karambelas who testified that on the morning of April 9, 1925, Lewis called him into his office, showed him a plat and location map of the subdivision which he said he was going to put on the market at the weekly meeting of his sales force that night. Karambelas informed Lewis he thought he could sell some of it and requested information about the property. Lewis explained the plat and map to him, pointed out block one, a triangular tract containing sixteen lots bounded by Main street on the south, Gross Point road on the west and Lincoln avenue on the north. He told Karambelas that property values were determined by location and that this was one of the best locations to be had due to the fact the lots had double frontage, fronting on Lincoln avenue, the Gross Point road and Main street; that block one was restricted for business buildings. He also pointed out how close the property was to the elevated station, to the built-up section of Niles Center and explained that Lincoln avenue was the shortest route into Chicago. Karambelas then remarked that the price marked on the plat seemed high; whereupon Lewis stated Main street was to be a State highway, that in 1923 the legislature had passed the $100,000,000 Bond Issue act to build hard roads, that one of the routes included in the act was to run from Evanston thirty miles west to Elgin and that Main street was to be that highway. He testified that Lewis further told him the purchaser would have no paving assessments to pay, since

the paving would be done at the expense of the State and county, except as to a foot or so at the curb.

Karambelas testified that he asked Lewis for a copy of the map and took it into the office of the general managers, Kaplan and Miller, in the same suite. He showed the plat to them and remarked that the price of this block as marked on the plat figured $121,150. Kaplan then told him he had helped Lewis fix the price on it and thought Lewis had priced it too low; that it was a wonderful piece of property to buy; that Main street marked on the plat would be a State highway; that he was going to take one-third of block one himself and suggested Karambelas take an interest and find someone who had money to invest to take the balance. He also testified that before he left he agreed to take one-third of one-half, and Kaplan two-thirds of one-half, and Karambelas said he would try to interest some one in the other half.

Karambelas testified that he immediately went to the office of complainant who was then Health Commissioner of the city of Chicago, exhibited to him the map showing the location of the property, together with a plat of the subdivision, and pointed out block one thereon, told him he was connected with the Lewis organization and was selling property for them. He testified that he called attention to Lincoln avenue, a paved street along the north side, as being the shortest route to Chicago, Gross Point road, a gravel road along the west side, the general location of the premises with reference to the surrounding territory; its proximity to the elevated station and the fact it was located in Niles Center; pointed out Main street, shown on the map, bounding the south side of the block, and stated it would be the State highway connecting Elgin with Evanston. He testified that he did not represent that Main street was paved but on the contrary told Bundesen on this occasion the property looked raw; that Bundesen said he did not care to see it; that Karambelas further explained that

Lewis' sales force were to have a meeting that night at which time Lewis would distribute maps of the subdivision and it would then be on the market and might be sold out in small pieces; that he told Bundesen that he and his boss, Kaplan, had mutually agreed to buy one-half interest in block one, provided he could find some one to take the other half, and that the block was priced at $121,150.

Karambelas also testified that Bundesen said he would send Karambelas to a friend and might come in himself; that he gave Karambelas a card introducing him to Major Percy Owen, then the prohibition director for the city of Chicago, to whom Karambelas explained the matter; that Owen said he was very much interested and asked the price; that Karambelas stated it, but said if Owen was interested he would see if he could get Lewis to reduce the price; that Owen suggested they meet in Dr. Bundesen's office at 1:30; that Karambelas returned to Lewis' office, told Kaplan the situation and asked him to be present at the meeting, and then saw Lewis, informed him he had parties interested in buying block one and asked him to make his bottom price, and that Lewis finally agreed to take $110,000 provided the buyers were persons financially able to pay. This would require a down payment of $24,000.

The record also shows that at the agreed hour, Karambelas and Kaplan met Owen and Bundesen at the latter's office and Karambelas introduced Kaplan as the man he worked for under Lewis. The reduction in price as made by Lewis was stated. Owen and Bundesen said they wanted to go in, each taking a quarter-interest. On being asked for a deposit Owen put up $500 in cash and Kaplan made out a preliminary contract and receipted Owen for the payment. When this transaction was reported to Lewis later that afternoon, he informed Karambelas and Kaplan that the payment made was too small and more·would have to be paid. Two days later Karambelas called on Bundesen who gave him a check for $1250 to which Karambelas added $250 of

his own funds and Lewis accepted it to apply on the stipulated down payment.

Thereafter, and prior to the time the formal contracts of purchase were signed, Karambelas showed the property to Owen, took him around the entire block, showed him the location of Main street and testified that at that time Main street did not extend west of this subdivision as a visible street but stakes could be seen west of the Gross Point road marking the location where the street had been dedicated and there were street signs marking its location beyond Parkside avenue. He testified Owen was much enthused over the purchase. Bundesen said he did not care to view it. Karambelas returned to Bundesen's office two or three times before he finally got the balance of the $12,000 required of Bundesen and Owen to complete their share of the down payment. Bundesen informed Karambelas that one-half of the money was Owen's but that Owen preferred that his name not appear in the contracts and had requested Bundesen see to it that his name was omitted from them. When this payment was completed on April 15, Bundesen, Kaplan and Karambelas, as joint purchasers, signed the formal contracts in question, prepared on regular forms used by the Lewis Realty Association in the sale of lots in this subdivision. There were thirteen of these contracts executed, each covering one or more of the sixteen lots in block one. Each contract specified the purchase price of the particular lot or lots involved, the amount paid, the amount of principal and interest required to be paid each month thereafter until the balance of the purchase price was paid and provided for the delivery of deeds on full settlement. Lewis testified the reason for the sale being evidenced by so many separate contracts was that Karambelas and Kaplan had come to him shortly after the sale, exhibited to him a plat which they had prepared showing a re-subdivision of block one and stated to him that the buyers planned to re-plat and re-sell the premises for $250,000, and

therefore wanted the separate contracts so they would not have to secure a release of the whole contract every time they sold a part of a block.

When the contracts were signed Karambelas gave his note for the $4000 required to make up his share of the down payment and the next day this note plus a check for $1500 representing his commission of five per cent on the sale were handed to him. He did not inform Bundesen he was getting a commission on the sale. He testified he did not know how Kaplan settled for his share of the purchase price. On February 24, 1926, Karambelas sold to the defendant Jacob Schwartz, one-half of his interest in the contracts.

Complainant Bundesen corroborated the testimony of Karambelas in so far as his dealings with Karambelas in connection with the sale were concerned and denied knowing that Karambelas received a commission, until he learned of that fact late in 1928. He testified he had purchased other real estate without inspecting it prior to its purchase; that he purchased two separate lots in a Krenn & Dato subdivision in March, 1925; that while Karambelas had been his brother-in-law for more than fifteen years prior to the time of this transaction, they had seldom visited one another. He said further that for some time prior to buying an interest in these lots the newspapers had been full of reports relative to the $100,000,000 Bond Issue roads and in reading about them he had been particularly attracted by the controversy over the political aspect of the bond issue as it was charged that the highways to be built under this issue were being used by Governor Small to further his political fortunes.

Bundesen further testified that Karambelas' representation about Main street being route 58 from Elgin to Evanston was the "high spot" of the sales argument; that Karambelas showed him the plat of the subdivision with Main street adjoining the south line of block one and showing

"Location of Main street and Lincoln avenue 'L' subdivision" by which it appeared that Main street extended in an unbroken line from Evanston west beyond the north branch of the Chicago River to the edge of the map and that Karambelas called that to his attention as indicating the line of the State highway. He further stated he relied upon the representations made by Karambelas and was induced to buy because of his reliance upon the statement that Main street was a through highway that would be opened from Elgin to Evanston as a State highway. He testified Karambelas also told him that being a State highway, the paving of it would be done at the expense of the State.

It further appears from Bundesen's testimony that about two months after the contracts were signed Owen reported he was in financial straits and asked Bundesen if he would take over his share and Bundesen rebated to Owen the money he had invested and thereafter paid the monthly payments due on one-half the contract price. It further appears from his testimony that he and a friend visited the property in the company of Karambelas either in the spring or midsummer of 1927 at which time Karambelas showed the lots and surrounding streets to him and pointed out the farmhouse on the premises which had become in bad repair. Bundesen did not recall whether there was a thoroughfare abutting on the south side of block one on this, his first visit to the property.

In the fall of 1927 Kaplan informed Bundesen he could no longer keep up his payments and on October 8, 1927, Bundesen took an assignment of Kaplan's interest and paid up Kaplan's arrearages, then amounting to $10,862.65. Bundesen and Karambelas paid the general taxes for the years 1926 and 1927 on the premises, amounting to $206.39. In the fall of 1927 he had the house on the premises torn down and removed.

Bundesen testified that he first learned Main street was not a public highway about July, 1928, when he went to his

bank to secure a loan by way of a mortgage to refinance his property. In making his application for the loan he stated the premises were on a State highway and the bank informed him they were not. He made no further payments and soon thereafter opened negotiations for a rescission of his contracts.

The record further discloses that there was considerable speculation in real estate in the Chicago area in the year 1925 and there is some evidence in the record of sales of subdivision lots in the general, and some in the immediate, vicinity of this property occurring about the time this sale was made at prices apparently not disproportionate to that for which these lots were purchased. Lewis denied telling Karambelas that Main street was or would be a State highway. There is evidence in the record that while Main street in 1925 had not been opened as a street beyond the west line of these lots, it had been dedicated as such for at least most of the way for some distance west. It also appears that Main street was paved through these premises at the time of the hearing. The record also shows that proof was made before the master that the respective purchasers had then paid on the contracts the following sums, including principal and interest: Dr. Bundesen, $52,681.25; Kaplan, $12,976.31; Schwartz, $6565.76; Karambelas, $5438.08. There is nothing in the record to show that either Kaplan or Karambelas was prompted by any improper motive to participate as purchasers but on the contrary the circumstances indicate their impelling motive was their belief, equally with Bundesen and Owen, in the favorable speculative value of the premises bought.

While many points are argued by the complainant in his briefs, his asserted right to the relief sought is bottomed primarily upon the alleged fraudulent misrepresentations made to him by Karambelas to the effect that Main street extended west beyond this property and that State bond issue route 58 from Elgin to Evanston would be on

that street along the south side of the premises involved in this litigation and in reliance upon the truth of these statements he was induced to sign the purchase contracts. This constitutes the main question in the case.

Rules governing transactions of this character have frequently been announced by this court. In *Weininger* v. *Metropolitan Fire Ins. Co.* 359 Ill. 584, it was said: "The presumption very properly is that all men are honest. Where fraud is charged it must affirmatively be proved by clear and convincing testimony. It cannot be established upon mere suspicion." The burden is upon the one alleging fraud to prove it by "such clear and convincing evidence that the mind is well satisfied that the charge is true." This is the rule announced in *Jaworski* v. *Sujewicz*, 334 Ill. 19; also in *Schiavone* v. *Ashton*, 332 id. 484; *Mosbarger* v. *Brown*, 313 id. 238; *Carter* v. *Carter*, 283 id. 324.

Complainant asserts that the purchaser of real estate is not required to disbelieve or to investigate the truth of representations made to him but is justified in relying thereon unless there are present at the time circumstances sufficient to put him on his guard. To sustain this proposition he cites *Morel* v. *Masalski*, 333 Ill. 41; *Herpich* v. *Williams*, 300 id. 540; *Gilbey* v. *Hamlin*, 297 id. 258, and *Leonard* v. *Springer*, 197 id. 532.

*Morel* v. *Masalski, supra,* does not support complainant's contention in this case. After stating the general rules applicable to false representations of a material fact, which include the contention of complainant, this court said: "These general rules, however, have some limitations. In all cases where it is sought to hold one liable for false representations the question necessarily arises whether, under all the circumstances, the party seeking relief had a right to rely upon the representations made. In determining this question the representations must be viewed in the light of all the facts of which the party injured had actual knowledge and also such as he might have availed himself

of by the exercise of ordinary prudence. If it appears that there were facts and circumstances present at the time the false representations were made sufficient to put the injured party upon his guard or to cast suspicion upon their truth, and he neglected to avail himself of the warning thus given, he will not afterwards be heard to complain, for the reason that his own conduct contributed to his injury. Ordinarily one is not liable for false representations respecting a mere question of law. (*Dillman* v. *Nadlehoffer,* 119 Ill. 567.) A person in possession of his mental faculties is not justified in relying upon representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is offered the opportunity of knowing the truth of the representations he is chargeable with knowledge. If he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by the misrepresentations. (*Dickinson* v. *Dickinson,* 305 Ill. 521; *Hustad* v. *Cerny,* 321 id. 354.) It is only in cases where the parties do not have equal knowledge or means of knowledge of the facts represented that equity will afford relief on the ground of fraud and misrepresentation.—*Johnson* v. *Miller,* 299 Ill. 276."

In that case relief was denied because the facts brought the case within the limitations above quoted. The evidentiary facts in *Hirpich* v. *Williams, supra, Gilbey* v. *Hamlin, supra,* and *Leonard* v. *Springer, supra,* are so different from those in the instant case that the holdings therein are not applicable here.

Complainant also refers us to *Felt* v. *Bell,* 205 Ill. 213, *Chicago Title and Trust Co.* v. *Schwartz,* 339 id. 184, and *Mohnk* v. *Seyfarth,* 339 id. 371, but the situations presented in each of these cases are readily differentiated from those delineated here. In the case of *Felt* v. *Bell, supra,* a vendor of certain patent rights joined with one of the purchasers to defraud the latter's co-partner into paying for a one-third interest, more than the agreed price for the entire

interest. The last two cases above mentioned are not analogous in that the broker who served was secretly receiving commissions from both parties without the other's knowledge and where their interests were opposed.

A brief review of the salient facts does not indicate that Dr. Bundesen was in any way overreached or hurried into this deal. They disclose that Dr. Bundesen is an intelligent and educated man and at the time of his purchase was holding a responsible public position in Chicago; that he had purchased other real estate prior to this transaction, some as recently as the preceding month; that when the instant proposition to buy was placed before him he was not interested in making an inspection of the property. He admits Karambelas informed him at the time of his first call that he was associated with the Lewis organization and was selling these lots for them. He was not deceived, therefore, as to the capacity in which nor for whom Karambelas was acting. He did not sign a formal contract nor pay out any money on the day the preliminary deal was made. His friend, Major Owen, put up the $500 that day. Bundesen did not make a payment until some two days later when he put up $1250 and did not pay the balance of the initial payment required of him nor sign a formal contract until April 15, six days after the deal was first discussed. During this interval Major Owen, his close personal friend, inspected the premises, was enthused over the purchase and paid in the balance of his one-fourth interest after this personal inspection and before the contracts were signed. Bundesen took over Owen's interest about two months later, repaying to him the sums he had previously paid. Bundesen made a personal visit to the lots in the spring or midsummer of 1927, saw that Main street was not paved but made no complaint. In October, following this inspection, he took an assignment of Kaplan's interest and paid up Kaplan's arrearages of nearly $11,000. During all this time and later Bundesen was making payments on the contracts.

In the fall of 1928 he applied to his bank for a loan to secure a mortgage in order to refinance his purchase and says that when he represented to the bank that these lots fronted on a State highway he learned for the first time that such was not the fact, and that during all this period from April, 1925, to the fall of 1928 he says he was entirely unaware that route 58 was not to be constructed along these premises. The record is devoid of any evidence whatever tending to indicate that anyone sought to prevent him from gaining such knowledge. It was not a fact peculiarly within the knowledge of the seller. It was not even a private matter. The facts concerning the location of route 58 were available as readily to Dr. Bundesen as to either Lewis or Karambelas, both before and during this entire period. Route 58 had its origin in the legislative act of June, 1923, known as the Second Bond Issue act. It provided for the issue of $100,000,000 of bonds, the proceeds of which were to be used to build certain specified hard-surfaced roads in Illinois and contained a provision requiring a referendum vote thereon by the people at the general election in November, 1924. There was incorporated in the act the additional requirement that it be published once each week for a period of three months prior to the general election hereinabove mentioned in a daily newspaper in Chicago and one in Springfield. It also provided that such publication of the act should be due notice to the people of the State of its provisions. Route 58 provided for under this law was a highway specified as the one to be constructed from Elgin to Evanston. The act did not describe the particular route to be followed between the two designated termini but vested in the State Department of Public Works and Buildings the power to determine the most feasible route to be followed and gave to that department the authority to purchase or condemn the required right of way where such action might be necessary. Ill. Rev. Stat. 1937, chap. 121, par. 281a *et seq.*, p. 2787.

As a matter of law Dr. Bundesen had notice of the provisions of this act. It was established at the hearing before the master that, consonant with the terms of the act reconnaisance surveys of at least three different routes west out of Evanston were made by the proper authorities, none of which were made on a street as far south as Main street; that thereafter a public hearing on the route to be selected was advertised and held at the Hotel Sherman in Chicago in March, 1927, and that a short time later Simpson street and Golf road were fixed as route 58 from the boundary of Evanston west to DesPlaines.

Dr. Bundesen was a resident of Chicago during all this period. He knew or should have known that by the use of the telephone or the mails he could learn from the department at any time whether the location of route 58 had been determined, and, if so, its course west out of Evanston. Dr. Bundesen was not an illiterate man, nor ignorant of public affairs. At the time of his purchase he occupied the important and responsible position of commissioner of health of the city of Chicago, was subsequently elected coroner of Cook county and at the time of the hearing before the master, was president of the board of health of Chicago. He had read a great deal in the newspapers about these bond issue roads prior to his purchase and he said the thing that attracted him particularly was that Governor Small was said to be utilizing these roads to further his political fortunes. Under these circumstances it can not be said that Dr. Bundesen had a right to rely upon the alleged declaration of Karambelas as early as April 9, 1925, that Main street would be the route to connect Elgin and Evanston.

As this court said in *Dickinson* v. *Dickinson*, 305 Ill. 521: "A party in possession of his mental faculties is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity

of knowing the truth of the representations he is chargeable with knowledge. If one does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations." Where no deceit has been practiced nor fraudulent misrepresentation made which ordinary prudence could not detect, the law will not aid one capable of protecting his own interests because he makes a bad or losing bargain. (*Hustad* v. *Cerny,* 321 Ill. 354; *Johnson* v. *Miller,* 299 id. 276.) There was no distinction here in the means of knowledge of any of these parties respecting the location of route 58. The information pertaining to it was readily available to any inquirer. Appellee's claim that the representation that Main street extends west beyond this property, which the master found to be the representation of a material fact, influenced him, can scarcely avail him here, since he, in the summer of 1927, viewed the premises and thereafter not only continued his payments, but took over Kaplan's interest. He must be held now to have waived any claim to a rescission of the contract on that ground.

The conclusion is inescapable that no actionable fraud on the part of any of the appellants here was established by the evidence. The decree of the trial court dismissing the third amended bill and supplemental bill of the complainant and the respective cross-bills of cross-complainants, Karambelas, Schwartz and Kaplan for want of equity was right. In this view of the record it becomes unnecessary to consider other questions raised on this appeal.

The judgment of the Appellate Court for the First District, except as it affects Schwartz, is reversed and the decree of the superior court of Cook county is affirmed.

*Judgment of Appellate Court reversed.*
*Decree of superior court affirmed.*