**WILLIAM WHITMAN COMPANY, Inc.**
**(formerly The National Refining**
**Company), Plaintiff,**

**v.**

**UNIVERSAL OIL PRODUCTS COM-**
**PANY, Defendant.**

**Civ. A. No. 987.**

United States District Court
D. Delaware.

July 16, 1954.

---

Caleb S. Layton, Richards, Layton & Finger, Wilmington, Del., Walter J. Milde, Robert W. Poore, Allen C. Holmes, James T. Lynn, Jones, Day, Cockley & Reavis, Cleveland, Ohio, Thorley von Holst, Thiess, Olson & Mecklenburger, Chicago, Ill., for plaintiff.

E. Ennalls Berl and William S. Potter, Berl, Potter & Anderson, Wilmington, Del., Ralph S. Harris, Frederick W. P. Lorenzen, Joanna H. Maxwell, Adrien L. Ringuette, Dwight, Royall, Harris, Keogel & Caskey, New York City, Charles M. Thomas, Washington, D. C., John G. Woods, Des Plaines, Ill., for defendant.

RODNEY, District Judge.

This action, based on fraud, traces its devious course back to 1929 and 1931. This preliminary and abbreviated statement of facts is largely taken from a former opinion of this Court of July 12, 1950, 92 F.Supp. 885.

In 1929 and 1931 defendant's predecessor, a South Dakota corporation of the same name as defendant, commenced two suits in this court against the Winkler-Koch Engineering Co. and the Root Refining Company, respectively, charging them with the infringement of two of its patents, the Egloff and Dubbs patents. These suits were consolidated for trial, and an opinion was filed on April 27, 1934, sustaining the validity of the patents and holding that they were infringed by the process practiced by Root.[1] Root appealed to the Circuit Court of Appeals for this Circuit, and that court unanimously affirmed the decree of the District Court, the opinion being written by Judge J. Warren Davis. Rehearing of the case was subsequently denied by the Circuit Court of Appeals[2] and the Supreme Court denied Root's petition for certiorari.[3] The present defendant was substituted for the South Dakota corporation in the Root case by an order of this Court entered pursuant to an opinion dated October 9, 1936, 16 F.Supp. 846.

In the meantime Universal Oil Products had brought patent infringement suits against other oil companies, including plaintiff in the present action, and especially against the present plaintiff in a suit in Kansas. This last mentioned suit was settled by an agreement of April 1, 1937. Around this agreement and settlement cluster all of the difficulties of the present case. That agreement must herein receive such detailed consideration that it must be sufficient at this point to merely state that it is alleged by the plaintiff that it was induced to become a party to such settlement by fraud and by reason of its reliance upon defendant's representation that it (Universal) had obtained a valid judgment in its favor in the Root case.

In 1941 proceedings were instituted in the United States Circuit Court of Appeals for the Third Circuit, as it was then designated, upon the initiative of certain lawyers, who had originally represented Root Refining Company in the Root case but who were now acting in a somewhat personal capacity, to have that court inquire into the integrity of its own judgment in the Root case. The suggestion was made that Judge Davis had been bribed by Universal to render a decision in Universal's favor when the Root case went up to the Circuit Court on appeal. A master was appointed and seems to have made extensive investigation of the facts. Universal took part in these proceedings, but Root Refining Company did not do so, its former attorneys acting in the proceedings simply as amici curiae. The master rendered a report in 1943, in which he concluded that there was such fraud in connection with the appellate proceedings in the Root case as tainted and invalidated the judgments rendered by the Circuit Court of Appeals on June 26, 1935.

---

1. Universal Oil Products Co. v. Winkler-Koch Engineering Co., D.C., 6 F.Supp. 763.

2. Root Refining Co. v. Universal Oil Products, 3 Cir., 78 F.2d 991.

3. 296 U.S. 626, 56 S.Ct. 149, 80 L.Ed. 445.

On June 15, 1944, the Circuit Court of Appeals entered an order that the judgments be vacated and the cases reargued. Thereafter the amici curiae applied to the Circuit Court for an order directing that their expenses and compensation and those of the master be taxed against Universal. The Circuit Court granted this application on December 29, 1944, 3 Cir., 147 F.2d 259. Universal petitioned the Supreme Court for a writ of certiorari with respect to the order of December 29, 1944. The Supreme Court reversed the judgment of the Circuit Court, as far as the compensation and expenses of the amici curiae were concerned.[4]

Thereafter the Circuit Court of Appeals decided to vacate its order of June 15, 1944, and on June 20, 1947, it entered an order to that effect. The order also directed Universal to show cause why the judgment of affirmance in the Root case should not be set aside and vacated by reason of the alleged fraud and corruption practiced upon the Circuit Court by Universal or those acting for it; it permitted the intervention of Skelly Oil Company and authorized the Attorney General or some member of his staff to appear as amicus curiae.

The Chief Justice of the United States designated three judges from other circuits to sit as the Circuit Court of Appeals for the Third Circuit in further proceedings in this matter. In the meantime Whitman filed a motion in the Circuit Court for leave to intervene. The intervention was permitted by an order of that court on April 6, 1948, over the opposition of Universal. In the same order the court formulated the charges to be tried, which were, in essence, whether the action of Judge Davis in the case had been influenced by an expectation of gain under an agreement with one Kaufman, and whether Kaufman had been employed by Universal to exercise improper influence upon Judge Davis. Hearings were held and extensive testimony was taken by the Court of Appeals. It found that the judgments in the Root case were tainted with fraud and ordered the judgments to be vacated.[5] Finally, after Universal had unsuccessfully petitioned the Supreme Court for writs of certiorari and for rehearings upon the Supreme Court's denial of certiorari, the Court of Appeals issued its mandate directing the District Court to vacate its decrees in the Root case and to dismiss the bills of complaint therein, by reason of the fraud practiced upon the Court of Appeals by Universal.

In the meantime the Kansas suit of Universal against National which had been instituted in 1935 was being maintained. Intermittent attempts to arrange a license from Universal to National and a settlement of pending matters had continued, but on December 13, 1936, National had refused the license on the terms then offered. The Kansas case was being prepared and trial had been set for April 26, 1937. On March 13, 1937, Universal filed an amendment setting up the original affirmance of the Root case in the Circuit Court of the Third Circuit as a bar to National's defense on the merits on the ground of res judicata.

The agreement of April 1, 1937 quickly followed and the then pending suit was discontinued. The plaintiff contends that the defendant had corruptly and fraudulently obtained the affirmance in the Root case and that it fraudulently used such corruptly-obtained judgment as res judicata in the Kansas case. The plaintiff therefore seeks rescission of the contract of April 1, 1937, together with other relief.

It will be borne in mind that the name of the plaintiff, "William Whitman, Inc.," is a new name for the same corporation formerly known as "National Refining Co." and as mentioned in this opinion.

This case contains many complex questions of law and of fact. Elaborate

4. 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447.

5. 3 Cir., 169 F.2d 514.

findings of fact and conclusions of law are separately filed. The case has consumed 97 days of actual trial, almost 13,000 pages of testimony in 32 volumes and contains many thousand exhibits. Voluminous briefs have been filed and numerous arguments had. It has been impossible to compress within more reasonable limits the consideration of the many questions presented. The skill, uniform courtesy and helpfulness of counsel have contributed to a very large extent in lessening the burdens of the court.

Two questions should be disposed of in limine. In the agreement between the parties, hereinafter discussed in detail, some patents of the plaintiff were assigned to the defendant. Originally some claim as to these patents was made, but the question has been considered as moot and will receive no further consideration herein.

Secondly, a great quantity of exhibits, over four hundred in number, were offered in evidence, en masse, by the plaintiff. The defendant has entered both a general objection and a series of individual and special objections and moves that the exhibits be stricken. In a large measure the exhibits represent the culling of old files of the parties, long discarded, and represent old correspondence and inter-office memoranda. No witness testified to the authenticity of the exhibits and they do not seem to satisfy the requirements of the Federal Business Records Act, 28 U.S.C. § 1732. None of the exhibits has been considered as material in the ensuing opinion and I think the motion of the defendant should be granted and the exhibits excluded.

I have been requested, initially, to determine as to which jurisdiction we must look for the applicable law. There are so many facets involved in the case at bar it is difficult to determine as to which phase I am requested to examine the law of a particular jurisdiction. It is, of course, useless to expend a long time upon the question of the applicability of a particular jurisdiction where it is not shown to have a distinct application differing from that of other jurisdictions. There are, however, some aspects of the case in which the law is not entirely uniform.

The plaintiff contends that the matter should be determined by what it calls the "Federal Common Law" and, failing that, the law of Ohio should be applied. The defendant contends that in this diversity case the law of the forum, Delaware, should be applied, and, failing that, the law of Illinois should control.

The plaintiff contends that this case had its origin in the bribery and corruption of a Federal judge by the present defendant; that the Constitution and laws of the United States have fully and exclusively provided for the existence, appointment, tenure and all other matters concerning a Federal judge and that matters concerning the probity, or lack of such probity, are matters to be determined by Federal principles and not by State law. The plaintiff contends that all diversity cases are not subject to the rule of Erie R. Co. v. Tompkins.[6] A number of cases hold that the rule of Erie R. Co. v. Tompkins is not applicable to those areas of judicial decision where the policy of the law is dominated by Federal legislation or control.[7]

If there be any peculiar principles of the so-called Federal Common Law differing from the principles of the applicable state law, which is not apparent to me, yet still I do not think such principles would have application in the present case. This case involves a contractual relationship between the parties to this action. It seeks rescission of that contract and other remedies connected with that contractual relationship. Any connection of the particular

6. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

7. O'Brien v. Western Union Tel. Co., 1 Cir., 113 F.2d 539; Sola Elec. Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Mitchell v. Flintkote Co., 2 Cir., 185 F.2d 1008; U. S. v. Standard Oil Co. of Cal., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067.

Federal judge with any of the parties in this case long antedated the direct contractual relationship between the present parties and with respect to which this present suit must be determined.

■ The plaintiff in contending for the Federal Common Law largely relies upon the bribery and corruption of the Federal judge as the basis of the present action. At a later stage in this opinion it is found that any cause of action of the plaintiff is not based upon that fraud and corruption of the judge, but upon the fraudulent use of that corruptly-obtained judgment as res judicata in an action between the parties. I think any Federal Common Law as distinguished from applicable State law is not involved.

■■ I am thus, by Klaxon v. Stentor Electric Mfg. Co.,[8] remanded to the Delaware Courts for the applicable principle of Conflict of Laws. It has been held in Delaware, in tort actions, the law of the place of the wrong determines the question of the breach of duty and that the place of wrong is where the final act occurred which establishes liability.[9] So in matters of contract this Court has held[10] that under Delaware law the validity and construction of a contract is to be determined by the law of the place where the contract was made.

Failing the adoption of a Federal Common Law, the plaintiff contends that the law of Ohio should govern. It contends that Ohio was the place where the operable facts were centered: (1) that it was the location of the plaintiff's offices where negotiations for the contract were made; (2) that the contract was executed by the respective presidents and secretaries in Ohio; (3) that the royalty payments were sent from Ohio and additional reasons for the selection of Ohio are given.

The defendant contends that if the law of Delaware should not govern, then consideration should be based upon the law of Illinois. The defendant, admitting the signature of the contracts in Ohio, contends they were not complete until seals were affixed in New York and delivery then made by mail, and that the contract was not effective until delivery. The defendant contends that the main obligation of the plaintiff was the payment of royalties and that by express provision of the license agreement this payment of royalties was to be made in Illinois.

Parenthetically I may remark that insofar as the interposition of the corruptly-obtained judgment as res judicata in the Kansas case was concerned, such action formally and officially took place in Kansas.

No element of the law is in more confusion than that under the conflict of laws and the conflict between the places of making and performance of a contract where such places are not the same. Even if this matter was an open one, I am spared such consideration. Here I am not confronted with questions of the validity or construction of the contract. No question of construction exists and the validity at the time of execution and for a number of years is unquestioned. The contract was a valid but voidable contract. The question is the rescission of the contract brought about by extraneous matters, viz., fraud, separate from and unmentioned in the contract. Similarly, I am not concerned with questions of performance of the contract except as such questions impinge upon the quantum of performance.

Insofar as the impact of fraud upon a contract is concerned and as affecting rescission of the contract, I find little difference between the various jurisdictions. Other matters appearing herein,

8. 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

9. Geller v. Transamerica Corp., D.C.Del., 53 F.Supp. 625, affirmed 3 Cir., 151 F.2d 534; Black & Yates, Inc. v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 148 A.L.R. 841.

10. Kane v. Chrysler Corp., D.C., 80 F. Supp. 360.

however, seem to require a more definite adoption of controlling law.

In the license agreement, constituting a portion of the contract, appears this precise statement of agreement of the parties:

"22. This agreement shall be considered as a contract executed and delivered at Chicago, Illinois, U. S. A."

It is thus clearly the intent of the parties that the place of a large part of the performance should be joined to the place of execution and delivery of the contract and that all should be "considered" to have occurred in Illinois.

Many cases have held that the intent of the parties is the true test of the application of Conflict of Laws, and that questions, both of the making of the contract and its performance are, in reality, based upon principles of the intent of the parties. See 11 Am.Jur., Conflict of Laws, Sec. 119, page 404.

Questions of the weight to be given to the expressed intent of the parties as to the governing law have usually arisen in connection with the validity of the contract or construction of its terms. I have neither question.

■ That the intent of the parties to a contract that such contract shall be considered in connection with the law of a particular jurisdiction has been considered in many cases holding that such intent will be respected by the courts.[11]

Of course, such intent may not be violative of either the public policy or statute of the forum or adopted for the purpose of evading an otherwise applicable law. It is also true that the jurisdiction whose law is adopted by the express intent of the parties must be one which has a real connection with one or more of the various elements of the contract and parties may not arbitrarily select the law of some jurisdiction which has

no relation to the matter in controversy. Indeed, in an annotation upon the latter point in 112 A.L.R. 124, it is assumed that a stipulation or agreement of the parties would be effective if it referred the contract to either the place where it was made or to the place where it was to be performed and the stipulation was only ineffective when it sought to make applicable the law of some jurisdiction having no ostensible connection with the contract.

In 2 Beale on Conflict of Laws, p. 1100, in speaking of questions arising from validity or effect of a contract, it is said, "But, on the whole, as will be shown, the prevailing tendency is to regard the intention of the parties as controlling. * * *"

Again, at page 1116, it is said, "When the parties expressly agree that the contract shall be subject to a certain law, in other words, when their intention is expressed, it has been intimated, though never expressly decided by the Supreme Court, that the courts will give effect to that intention. * * *" (Citing cases.) This express decision, it seems to me, came in 1953 in Lauritzen v. Larsen, 345 U.S. 571, 588–589, 73 S. Ct. 921, 931, 97 L.Ed. 1254, where it is said, "Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."

In Delaware, to whose law I must primarily look, it has been held in Wilmington Trust Co. v. Wilmington Trust Co., 26 Del.Ch. 397, 24 A.2d 309, 313, 139 A. L.R. 1117, that, "Contracting parties, within definite limits, have some right of choice in the selection of the jurisdiction under whose law their contract is to be governed." There the court held that an expressed intent by a donor of a trust should "be respected by the courts, if the selected jurisdiction has a material connection with the transaction." An expressed intent of the par-

11. Liberty Nat. Bank & Trust Co. v. New England Investors Shares, D.C., 25 F. 2d 493; Palmer v. Chamberlin, 5 Cir., 191 F.2d 532, 859, 27 A.L.R.2d 416;

Mutual Life Ins. Co. of New York v. Hill, 193 U.S. 551, 24 S.Ct. 538, 48 L. Ed. 788.

ties was also considered to some extent by this court in Kane v. Chrysler Corp., D.C., 80 F.Supp. 360.

It has already been pointed out that the jurisdiction stipulated by the parties was that of Illinois, having a material connection with the transaction as being the place of performance of a large measure of the obligation of the plaintiff.

■ The parties having expressly stipulated that the agreement "shall be considered as a contract executed and delivered" in Illinois, and that being a place of performance and a material locale, I must give that intent due weight. This would be so, I think, if conditions were reversed. If the plaintiff was in arrears in payment of royalties and defendant brought suit to recover such royalties, such right of action would, I think, be subject to the law of Illinois.

At this early point in the discussion it becomes necessary to clearly understand the claim of the plaintiff and the remedy by which it seeks to enforce such claim. It will be advisable to consider certain language largely appearing in the pleadings, briefs and argument. The plaintiff contends that the action is for "restitution, rescission and other relief." These words "rescission" and "restitution" are words much disputed in the present litigation as to both their concept and application. The word "rescission", both as to its meaning and application, must receive elaborate attention herein. The word "restitution" as applicable to this case is not so clear. As a word descriptive of a distinct cause of action or claim of a party it has a definite meaning in the law; viz., that a party against whom an

erroneous judgment or decree has been carried into effect is entitled, upon reversal of such judgment or decree, to have restitution, by writ of restitution if necessary, of what he had lost thereby.[12] It also has a more general meaning as indicative of the principles attending the restoration or return or reparation to which a party may be proven to be entitled in an appropriate proceeding, and is connected with the principle of unjust enrichment. In such sense it is used in many authorities,[13] and is specially treated by the American Law Institute as a separate volume.

This, then, requires consideration of what is the cause of action or claim of the plaintiff. By "cause of action" I do not intimate that the meaning of those words can be set out with exactitude. I am aware of the fact that the term is an elusive one having one meaning for one purpose and a different one for another. The Supreme Court has not committed itself to a single definition.[14] I am aware that the Supreme Court has said,[15] "A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show." I must, however, pin-point the unlawful violation of a right of which the plaintiff complains and endeavor to fit this with established principles and with the facts.

The original complaint filed herein December 28, 1946 was largely and mainly based on rescission and prayed that the contract entered into between the parties and dated as of April 1, 1937 should be rescinded and tendering on the part of the plaintiff restoration of benefits received by it. On May 31, 1949 the present amended complaint was

12. Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517; Baltimore & O. R. R. Co. v. U. S., 279 U.S. 781, 786, 49 S.Ct. 492, 73 L.Ed. 954; Northwestern Fuel Co. v. Brock, 139 U.S. 216, 219, 11 S. Ct. 523, 35 L.Ed. 151; Haebler v. Myers, 132 N.Y. 363, 30 N.E. 963, 15 L.R.A. 588.

13. Atlantic Coast Line R. Co. v. State of Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L. Ed. 1451.

14. U. S. v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619, quoted by this Court in Van Brode Milling Co. v. Kellogg, D.C., 113 F.Supp. 845, 850.

15. Baltimore Steamship Co. v. Phillips, 274 U.S. 316, 321, 47 S.Ct. 600, 602, 71 L.Ed. 1069.

filed which is more elaborate. In this complaint rescission of the contract of April 1, 1937 is again expressly sought. In addition the plaintiff seeks the recovery of all monies paid by it as royalties under the contract of April 1, 1937 and a discharge of all accrued and unpaid royalties and all commitments under that contract. A judgment is sought for all expenses incurred in several matters formerly in litigation between the parties. Injunctive relief is sought concerning any action by defendant on any patents mentioned in the agreement of 1937, together with a reassignment to plaintiff of any patents assigned to defendant by plaintiff under that agreement. Finally, exemplary and punitive damages are sought by reason of the defendant's fraudulent conduct.

I must still determine the nature of the plaintiff's action. That it is in equity seems clear. That it seeks the equitable remedy of rescission of the contract of April 1, 1937 and injunctive relief is equally clear. The plaintiff's contention is that the action is for "restitution, rescission and other relief." If by this word "restitution" is meant a method of restoration of that to which the plaintiff may be entitled, then certain principles would apply. If by such word there is claimed a specific cause or form of action cognizable in equity, then different considerations must arise.

■ Under the Rules there is only one form of action. It is not now necessary to bring the action within the technical niceties theretofore required but, just as the new rules did not abolish the distinction between equitable and legal rights,[16] so the facts alleged in a complaint must still show an allegation of facts consistent or appropriate to some enforceable cause of action.

To determine the meaning of "restitution" as used by the plaintiff, it is necessary to again state a few basic facts.

Universal sued Winkler-Koch Engineering Co. and Root in Delaware for patent infringement and succeeded in such suit.[17] On appeal the decree was affirmed by the Court of Appeals.[18] The affirmance, it has been found, was accomplished by fraud and bribery[19] and the original decree and affirmance were set aside. I am estopped to question the fact of such bribery and fraud.[20]

Before the bribery and fraud were discovered or established, it is contended that the defendant, using the bribery-procured affirmance as a lever, compelled the plaintiff to enter into the contract of April 1, 1937 as a consequence of which the plaintiff has suffered the loss of which it complains.

Bribery and fraud must be assumed by me in the obtaining of the affirmed judgment. This bribery and fraud was of a most serious character as affecting the purity and integrity of judicial processes. Without in any way minimizing the enormity of the bribery or fraud, I must inquire when the rights of the plaintiff emerged as a consequence thereof. The plaintiff was not a party of record to the action in which the bribery occurred. It received no rights as a member of the general public as a vindicator of public justice or an avenger of a violation thereof. It is contended that by reason of the bribed judgment the plaintiff was forced to enter into the contract of April 1, 1937 and that fact must be subsequently considered.

The plaintiff contends, however, that with reference to the principles of the action of restitution it had, because of the facts, some personal rights in the judgment itself affected by the bribery. To consider this matter some further facts require attention. While the Root cases (Universal v. Root) were pending in the Delaware District, Universal sued National in the Northern District of Ohio at Cleveland for infringement of the same patents as involved in the Del-

16. Byram v. Vaughn, D.C., 68 F.Supp. 981, and cases cited; 2 Moore Fed.Pr., p. 301 et seq.

17. D.C., 6 F.Supp. 763.

18. 3 Cir., 78 F.2d 991.

19. 3 Cir., 169 F.2d 514.

20. D.C., 92 F.Supp. 885.

aware action. While the Root cases in the Third Circuit were pending on appeal, the case of Universal against National in Ohio was dismissed on plaintiff's application and without prejudice and a new suit was instituted in Kansas.

From the time of the determination of the Root cases in Delaware some negotiations had been conducted relative to National's taking a license from Universal. When on June 26, 1935 the Court of Appeals for the Third Circuit affirmed the decree of Judge Nields in the Delaware Root cases, Universal immediately telegraphed to National the fact of such affirmance and sent it a copy of the opinion. In March of 1936 the present defendant (Universal of Delaware) moved in the Kansas case to be substituted formally for Universal of South Dakota and set up the Root judgment as a persuasive precedent. For a long period and during all of the litigation concerning the validity of the Winkler-Koch process utilized by National there had been a defense fund maintained by and contributed to by the users of the Winkler-Koch process for use in defending such users from infringement actions.

On March 13, 1937 Universal filed an amendment to its supplemental complaint in the Kansas case setting forth the affirmance by the Court of Appeals for the Third Circuit of the Delaware judgment in the Root cases and asserting it as res judicata against National and at or about the same time the facts concerning the defense fund and National's contributions thereto were disclosed by depositions of National's officers.

National was informed by some of its counsel that the injection of the principles of res judicata would prevent the trial of the Kansas suit upon its merits and, after further negotiations, the license agreement between National and Universal was entered into as of April 1, 1937.

Under these circumstances the plaintiff seeks to draw from the plea of res judicata by the defendant in the Kansas case some strengthening inferences in support of its theory of restitution. The plaintiff seeks to show that as it was bound by the plea of res judicata from defending the case in Kansas on the merits, so it was such a party interested in the Root decision, from which the basis of res judicata originated, that it was so interested in the subsequent reversal of that judgment that the action of restitution allowable in such cases devolved upon it. Without reviewing all of the evidence or critically examining the voluminous briefs on the subject, I am of the opinion that the plea of res judicata can have no such effect and did not constitute a sole or conclusive reason for the subsequent agreement. In the first place the doctrine of res judicata as applicable to the case then pending was never determined, nor is it clear that it ever would have been determined as preventing National from defending on the merits. While Universal seems to have considered for some time the applicability of the doctrine of res judicata, it does not appear to have been confident of its success. On the other hand, counsel for National had given early consideration to the subject and had early considered that National had little to fear and at least one of its counsel thought that Universal itself could not expect to prevail. While some of National's counsel may have subsequently been of a somewhat different opinion and more doubtful of the outcome, the doctrine of res judicata of and in itself does not seem to me to have been the sole cause of the agreement of April 1, 1937. Certainly the President of National did not present to his Board of Directors the impossibility of defending the Kansas suit on the merits by reason of the application of res judicata as any reason for the consummation of the contract of April 1, 1937.

I am of the opinion that the cause of action of the plaintiff did not arise from the bribery in an action to which the plaintiff was not a party but arose, if at all, upon the use of that bribed judgment as a means of compulsion as to the contract of April 1, 1937.

█ I am of the opinion that "restitution" as used by the plaintiff is not to be considered by me as a specific cause of action growing out of the bribed and fraudulently acquired judgment, but as a factor to be considered in connection with the rescission of the contract which, as it is contended, was obtained or compelled by reason of the use of that bribed judgment.

In arriving at the foregoing conclusion I have, of course, given consideration to the cases mainly relied upon by the plaintiff, viz., Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134, 39 S.Ct. 237, and Hartford-Empire Co. v. Shawkee Mfg. Co., 3 Cir., 163 F.2d 474.

The Arkadelphia case, insofar as here applicable, seems to me a plain case sustaining the established principles of restitution. There certain railroads enjoined a State from fixing lower freight rates. The defendants were the members of the Railroad Commission, in their official capacity, and two shippers. By the injunction the railroads continued to receive the higher rates theretofore existing. The companies were required to keep an accurate account showing the difference between the rates actually paid and what would have been paid according to the lower and enjoined rates. The injunctions were made permanent, the court reserving jurisdiction. This decree was reversed by the Supreme Court [21] and upon the dissolution of the injunction the District Court appointed a master to ascertain the damages sustained by various shippers. These damages were allowed, being the difference between the rates required to be paid and what should have been paid. The Supreme Court [22] held it to be a typical case of restitution, viz., where an erroneous judgment has been rendered it is inherent in a court to correct that which has been wrongfully done by virtue of its process. Of particular interest is the holding that the railroad commis-

sion represented all the shippers and by virtue of the injunction against the commission the railroads exacted from the individual shippers and claimants the excessive charges which were the subject of the claimed restitution. The distinction between the Arkadelphia case and the present is, to me, very plain. There the Commission represented all the shippers to the same extent as if each had been separately named; there the excess charges were exacted from the individual shippers by reason of the injunction. Here the present plaintiff was not a party or represented in the Root judgment; here there was no proven privity between the present plaintiff and those directly injured by the Root judgment.

I am of the opinion that the principle of restitution as recognized in the Arkadelphia case is not applicable to the present litigation.

Hartford-Empire Co. v. Shawkee Mfg. Co., 3 Cir., 163 F.2d 474, has much of interest. I shall not recite the long and much litigated proceedings of Hartford. It is sufficient to say that by fraud in the Patent Office Hartford obtained a patent in 1928. Hartford then sued Hazel-Atlas for infringement of that fraudulently-obtained patent. It eventually succeeded.[23] In 1933 Hartford sued Shawkee for infringement of the same patent and, by virtue of the Hazel-Atlas case, obtained a decree.[24] In 1941 the fraud of Hartford was brought to light. As a result of the exposed fraud a petition for a bill of review was filed in the Court of Appeals but was denied and this holding was reversed in 322 U.S. 271, 64 S. Ct. 1014, 1015, 88 L.Ed. 1269. In this latter case the fraud was expressly excoriated and the District Court was instructed to permit "Shawkee and the others to bring such further proceedings as may be appropriate in accordance with their prayer for relief." In accordance with this broad command the defendant

21. Allen v. St. Louis, I. M. & S. R. Co., 230 U.S. 553, 33 S.Ct. 1030, 57 L.Ed. 1625.

22. 249 U.S. 134, 145, 146, 39 S.Ct. 237.

23. Hartford Empire Co. v. Hazel Atlas Glass Co., 3 Cir., 59 F.2d 399.

24. Shawkee Mfg. Co. v. Hartford Empire Co., 3 Cir., 68 F.2d 726.

filed its counterclaim in the original suit. Passing now the proceedings in the District Court,[25] I shall consider at this stage only that portion of the opinion of the Court of Appeals [26] which has reference to the subject now discussed, viz., restitution. The court held that the only portion of the claims of Shawkee cognizable under the principle of restitution was that of royalties, the other claims being designated as damages. The court held that Shawkee was entitled to restitution for the royalties paid under the following circumstances. Shawkee was a losing defendant in an infringement suit and against whom an injunction was issued. The royalty payments sought to be recovered by restitution were not made by any direct order of the injunction decree, but the court clearly held the royalty payments were made by reason of economic necessity as the result of the injunction decree. The court held:

> "* * * We do think that the clear weight of the evidence, as indicated, is that but for the injunction the Hartford feeders would have been superseded by non-royalty machines. The injunction stopped all that and forced Glenshaw and McKee to retain their old royalty contracts with Hartford (which otherwise could have been terminated) and to renew them at their expiration. The enforcement therefore of Hartford's fraudulent patent resulted in certain royalty payments * * which otherwise would not have been made."

The salient and important particulars as to restitution and distinguishing the Shawkee case from the present is that Shawkee was a direct party to the original proceeding in which the fraudulent patent was the controlling element; that as a result of that fraud practiced directly on Shawkee the royalty payments were made and these royalties so paid were sought by restitution. It would be mere reiteration to show that here National was no party to the fraudulently acquired judgment and that such fraudulently acquired judgment was but an element entering into the contract of April 1, 1937.

The plaintiff seeks rescission of the contract of April 1, 1937 because, as it contends, the gross fraud of the defendant was a material or controlling element in inducing the plaintiff to enter into such contract.

It is axiomatic that when fraud has induced a contract the defrauded party may affirm the contract and sue at law for his damages or he may disaffirm the contract and seek its rescission. Here the plaintiff, alleging fraud, seeks rescission.

It is first objected that because the remedy the plaintiff seeks is wholly or largely made up of monetary considerations equity has no jurisdiction but the remedy is at law. For this is cited a number of cases, such as Buzard v. Houston, 119 U.S. 347, 7 S.Ct. 249, 30 L.Ed. 451. It seems clear from these cases that in many instances where fraud has induced a contract the defrauded party may treat the contract as rescinded, restore the status quo, and where his claim is solely of a pecuniary nature the action must be at law for no equitable relief is necessary. Where the damages sought are pecuniary and the remedy at law requires the return of the status quo, it is difficult to discover the remedy at law when the status quo, through no fault of the plaintiff, cannot be restored. If there be no remedy at law because, from the nature of the facts, the exact status quo cannot be restored, and if there be no remedy at equity because the damages are solely or largely pecuniary, where is the remedy? It cannot be that gross fraud, if it be the foundation of the contract, would go unpunished. I am of the opinion that where the action seeks rescission of a contract induced by fraud and the relief to be accorded can only be determined by the application of equitable principles or a balancing of the equities, a remedy in equity is available as being more ade-

---

25. D.C., 67 F.Supp. 26.

26. 3 Cir., 163 F.2d 474, 477.

quate and efficient than any remedy at law, and this is true even though the only remedy sought in addition to rescission is pecuniary damages or, more properly speaking, a restoration of what has been unjustly obtained. The necessary resumption of the status quo applies to the status quo of the plaintiff as well as to that of the defendant, and where there is a necessary balancing of these equities which only a court of equity can bring about, a suit in equity is proper as it is only in the equitable moulding of the decree that the proper result can be accomplished. Of such cases is American Shipbuilding Co. v. Commonwealth S. S. Co., 6 Cir., 215 F. 296.

If, then, as I think, the claim of the plaintiff is cognizable in equity, then I must inquire whether, as charged, the contract complained of was, in fact, so founded on fraud as to warrant its rescission at the suit of the plaintiff. After that would be considered the question whether other principles of law or actions of the plaintiff, if any, would prevent such rescission. A determination of the effect of the fraud on the formation of the subsequent contract between the parties necessarily involves consideration of many facts. It is difficult to compress within reasonable limits the great mass of testimony with the accompanying inferences and conclusions. I must be content with a general statement of what I deem to be pertinent facts. From 1929 and 1931 National had been a user of the Winkler-Koch process. Root Refining Co. was also a user of this process. In 1929 Universal sued Root in Delaware alleging the Winkler-Koch process infringed patents of Universal. Some time after 1931 National became interested in obtaining engineering services and indemnity protection from some outside source. National at that time seemed not too successful by means of its own facilities. Overtures were made with Gasoline Products Corporation which did not materialize, and from 1934 there were intermittent negotiations with Universal relative to a license agreement between the parties. In April, 1934 the Delaware District Court sustained the validity of Universal's patents and held the Winkler-Koch process an infringement. Additional pressure was then exercised by Universal for National to take its license which was refused and active preparations were made for the trial of the Ohio action of Universal against National based upon the same patents as involved in the Root case. In July, 1934 the Root case in Delaware was appealed to the Circuit Court.

In January, 1935 the Root case was argued on appeal in the Circuit Court before Circuit Judges Buffington, Davis and Thompson. In February, 1935 while the Root case was being considered in the Circuit Court, the Ohio case of Universal against National was dismissed without prejudice, and in April, 1935 a new infringement suit of Universal against National was instituted in Kansas and based upon the use of the Winkler-Koch process as an infringement of the same patents as involved in the Root cases.

At this point the scene is shifted as we approach the bribery and fraud alleged as the reason for the rescission of the contract of April 1, 1937. This bribery originally involved one Kaufman and Judge Davis and concerned the relationship of Judge Davis with the Root cases. Kaufman was originally retained by Universal in 1932.[27] No bribery of Judge Davis by Kaufman with reference to the Root cases is material at that time because then there had been no decision even in the District Court in the Root case until April 27, 1934. The connection of Judge Davis with the Root cases could not have been definitely known until he became a member of the court to hear the Root case on appeal on January 7, 1935.

It has been judicially determined[28] that Kaufman was engaged by Universal to improperly influence Judge Davis in the Root cases and that Judge Davis was so improperly influenced, although the

27. Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514, 526.

28. 169 F.2d 514, 534.

bribery was not known or established until some years later. The actual bribery may not be the basis of the present plaintiff's claim because the plaintiff was not a party to the action in which such bribery occurred, yet the use of that judgment obtained by bribery and utilized by the bribing party against the present plaintiff must receive consideration. The actual bribery, while not directly to be considered, loses none of its characteristics. As Justice Roberts said in Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 251, 64 S.Ct. 997, 1004, 88 L.Ed. 1250, "No fraud is more odious than an attempt to subvert the administration of justice."

I must now consider what use was made of this corruptly-obtained judgment by the present defendant to whom the fact of corruption was known and as against the present plaintiff which was ignorant of any judgment taint. Within a few days of the judgment Universal wired National the fact of the affirmance and soon thereafter sent a copy of Judge Davis' opinion. A very obvious purpose of these notices was to facilitate the settlement of matters pending between Universal and National involving the same patents and looking toward a license from Universal to National. Notwithstanding the affirmance of the Root cases negotiations were intermittently continued between the parties and in March, 1936 Universal advanced, in the Kansas case, the affirmance of the Root judgment as a persuasive precedent. Whether negotiations were entirely broken off in December, 1936 or whether the door was left open for further negotiations is in some dispute, but seems of little importance. The Kansas case, on December 30, 1936 was set for trial on April 26, 1937.

On March 13, 1937 Universal filed an amendment to its complaint in the Kansas case in which it presented the judgment of the District Court of Delaware in the Root cases (as affirmed by the corruptly-acquired affirmance of the Third Circuit) as res judicata of the issues involved and as preventing any defense by National on the merits of the action. This is an important event and around it clusters many of the contentions of the parties.

The defendant (Universal) contends that the advancement of res judicata had no part in the consummation of the licenses as of April 1, 1937 and consequently is not material on the question of rescission. It contends that the licenses were taken because of the importance of the rights obtained by National and the superior quality of the services rendered by Universal and of National's great need for them. The defendant contends that since the parties to the Kansas suit were not the parties to the Root judgment and the issues not identical, res judicata, as such, could not have been successfully presented. National contends that at the time the operation of its refineries was the most profitable part of its business. It contends that the licenses as finally executed contained substantially the same provisions that it had repeatedly refused and that the presentation of res judicata with the fear that National might not be able to defend the Kansas suit on the merits of the action was the controlling reason for the execution of the agreement of April 1, 1937. I shall not review even briefly the voluminous testimony, including inferences, bearing on the reasons for the agreement of April 1, 1937. It is certain that both parties had long considered the application of res judicata. Certain ones among National's counsel had originally discounted its effect, but when National knew that Universal had obtained full information as to National's contribution to the defense fund of the Winkler-Koch process users, others among National's counsel feared the effect of res judicata and the possible inability to put in any defense to the infringement.

I shall not pause to consider the legal question as to whether res judicata could or could not have been successfully maintained and thereby estop National from any defense on the merits. It is sufficient if the fear of being deprived of any

defense was one of the moving reasons for the agreement.

That the interposition of res judicata on the eve of the Kansas trial was an important factor in the consummation of the agreement is, to me, obvious. Except for that plea the contract was the same which National had had the opportunity to accept for many months. The actual entry of res judicata with the background that National knew that Universal then possessed information as to the defense fund to which National was a party was sufficient, with other factors, to make National's counsel accept the agreement. Insofar as Universal is concerned, it is clear to me that Universal intended the principle of res judicata to bring about the agreement. Why else was the fraudulent judgment interposed? Universal knew that the Root judgment was fraudulent and knew that National did not have this knowledge. The use of the fraudulent Root judgment as res judicata was in itself a fraud.

 The matter contains all the elements constituting fraud sufficient to furnish the remedy to the plaintiff and as set out in Southern Development Co. of Nevada v. Silva, 125 U.S. 247, 250, 8 S.Ct. 881, 31 L.Ed. 678. To the same effect is Nye Odorless Incinerator Corp. v. Felton, 5 W.W.Harr. 236, 252, 35 Del. 236, 162 A. 504, 510. With some changes in phraseology it seems to be the general law in establishing such fraud to show that:

1. The defendant has made a representation in regard to a material fact.

2. That such representation was false.

3. That such representation was not actually believed by the defendant, on reasonable grounds, to be true.

4. That it was made with intent that it should be acted on.

5. That it was acted on by complainant to his damage.

6. That in so acting on it the complainant was ignorant of its falsity and reasonably believed it to be true.

The fraudulent representation of the defendant, viz., that the merits of the infringement of the Winkler-Koch process upon the patents of Universal had been legally determined in the Root cases, need not have been the sole inducement for the subsequent contract. It is sufficient that such false representation was so material that the contract would not have been made in its absence.[29]

 I am of the opinion that the fraud of the defendant was sufficient to rescind the contract entered into by reason of it unless other principles of law or actions of the parties prevent such rescission.

The defendant advances a number of reasons which, it argues, should so operate that rescission of the contract of April 1, 1937 should not be decreed.

The defendant argues:

(a) that if the plaintiff ever had any right of rescission, such right was lost by the failure to act when such action should have been taken and such failure to act and the receipt, acceptance and continuance of the benefits of the contract estop the plaintiff from obtaining rescission. With this may be considered the cognate or related principle that the fraudulently-obtained Root judgment of affirmance in the Third Circuit could have been collaterally attacked by National in the Kansas suit;

(b) that National is estopped from rescission by the Statute of Limitations;[29a]

(c) that National is estopped by laches;

(d) that National is estopped by the application of the doctrine of unclean hands;

(e) that National is estopped from rescission because of the impossibility of

---

29. Thomas v. Grise, 1 Pennewill 381, 17 Del. 381, 41 A. 883.

29a. 10 Delaware Code Annotated § 8106.

restoring Universal to the status which existed prior to the entering into of the contract and that the restoration of the "status quo" is a necessary element of rescission.

These must receive separate but limited treatment.

(a) The defendant relies upon the conduct of the plaintiff in failing to act in moving either to rescind or discontinue the contract when it should have acted and the continued receipt of benefits under the contract as a separate and distinct defense from limitations or laches. Some matters, including the dates of happening of certain events, may have a common interest.

With reference to any action by National arising out of the fraudulent use as res judicata of the fraudulently-acquired judgment in the Root cases, certain dates have materiality.

The fraudulently-obtained affirmance in the Root cases was June 26, 1935. This fraudulently-obtained judgment of affirmance was fraudulently interposed by defendant as a valid judgment constituting res judicata in the Kansas case March 13, 1937. The contract was executed as of April 1, 1937. In 1940 some grand jury proceedings considered the propriety of the relationship of Kaufman with Judge Davis in a different connection. In 1941 a master was appointed by the Third Circuit Court to investigate the validity of the Root judgment. The master reported October 19, 1943. This report was adopted June 15, 1944. Subsequent proceedings continued until 1948 and 1949.

The contention of the defendant as to the failure of the plaintiff to have sought timely relief from the provisions of the contract must be considered from two aspects since not only may the time at which the suggested action should have been taken not be the same in the two aspects, but certain principles may have different applications. The two aspects are (1) the plaintiff, by the terms of the contract, could have cancelled such contract and been relieved of any of its ob-ligations; or (2) it could have sought earlier rescission of the contract.

(1) The contract of April 1, 1937 by Article 13 provided that National, if not in default, could have cancelled the contract as of December 31, 1938 and any year thereafter by giving three months' prior written notice. National paid no royalties after June, 1944. Before June, 1944 there had been no established fraud with reference to affirmance of the Root judgment. After June, 1944 National could not have cancelled the contract except by removing the default by the payment of all royalties then due. The cancellation of the contract by National would have been no adequate remedy. By 1944 when fraud in the Root judgment received even its first official recognition, National had paid some $800,-000 in royalties under the contract of 1937. The cancellation of the contract would have had no effect on the recovery of these royalties already paid. The cancellation of the contract would have made National immediately subject to a suit for infringement and by cancellation National would have lost all benefits and services under the agreement. Universal contends that it was the continued right to enjoy these benefits which prompted National to continue the agreement in force. National was in default in July, 1944. Under paragraph 8 of the agreement, in case of default Universal could itself have cancelled the contract upon giving a prescribed notice. Just as Universal contends the license agreement was not terminated by National because it was beneficial to National, so I must assume it was not cancelled by Universal because the continuance of the license agreement was then beneficial to Universal.

I think the right to cancel the license agreement does not estop the present plaintiff in its application for rescission.

(2) The second aspect of the claim that the plaintiff has forfeited its right to rescission of the contract of April 1, 1937 is based upon a claimed

failure of plaintiff to seek timely relief by rescission. With this is inextricably interwoven the contention that the fraudulently acquired affirmance of the Root judgment in the Court of Appeals of the Third Circuit could have been collaterally attacked by National in the Kansas suit [29b] between Universal and National and before the validity of the Root judgment had been determined in the Circuit Court in which it was rendered. This latter point must be first considered. I am in entire accord with the general contention that there may be a collateral attack upon a judgment obtained by fraud of such a nature as to bring in question the jurisdiction of the court granting the judgment sought to be attacked or the legality of such judgment. Space and time do not permit a detailed discussion of the many cases cited by the defendant. It must be sufficient to state that I do not think that the affirmance of the Root judgment could have been collaterally attacked in the Kansas case by National prior to the determination of the Third Circuit Court itself. I think this is true both legally and factually. No case has been found where the fraud alleged as the ground of collaterally attacking a judgment of another court was the bribery of the court itself. Fortunately cases concerning the venality of a court or judge are of very rare occurrence. In no case has an inferior court in one jurisdiction allowed a collateral attack involving the bribery of a judge of a superior or appellate court of another jurisdiction.

In Crescent City Live Stock Landing & Slaughter-House Co. v. Butchers' Union, 120 U.S. 141, 159, 160, 7 S.Ct. 472, 482, 30 L.Ed. 614, it is said:

"It is an invincible presumption of the law that the judicial tribunal, acting within its jurisdiction, has acted impartially and honestly. The record of its proceedings imports verity; its judgments cannot be impugned except by direct process from superior authority."

In Restatement of the Law, "Judgments," § 124, it is said:

" * * * Public policy requires that an attack upon a judgment because of wrongful conduct by a duly-constituted court acting within its powers should be made by direct rather than by a collateral attack. * * * "

Factually, I am of the opinion that the Root judgment in the Third Circuit could not have been collaterally attacked in the Kansas suit so as to form the basis of the rescission of the agreement of April 1, 1937 prior to the conclusion of the investigation of the Root judgment by the Third Circuit Court itself. The sequence of dates must again be considered. In 1935 the corruptly-obtained affirmance of the Root judgment was rendered, although the fact of such corruption was not exposed until some years later. While some rumors of possible wrongdoing on the part of some one existed in 1940, I find nothing to warrant any action by National in Kansas.

On June 5, 1941 the first intimation of wrongdoing in the Root judgment was presented to the Third Circuit Court of Appeals, and on November 26, 1941 a master was appointed to make inquiry of the matter. The master was invested with plenary powers. The master was directed [30] "to receive relevant documents and evidence in the possession of the United States Department of Justice, its Bureau of Investigation, and United States Attorneys, and to inspect the federal grand jury proceedings in New York and Philadelphia." He was given power "to summon and swear witnesses and subject them to the examination and cross examination of the attorneys" and his fees and expenses were ordered to be paid. None of these powers or facili-

---

29b. Herein the doctrine of collateral attack of the Root judgment is only mentioned with reference to the Kansas case which was discontinued. It is assumed the same principles would apply to other appropriate jurisdictions in which the collateral attack might be presented.

30. Root Refining Co. v. Universal Oil Products Co., 3 Cir., 169 F.2d 514, 517.

ties would have existed at the instance of a private party in a Kansas litigation. Even if, legally, the Root judgment of affirmance in the Third Circuit could have been collaterally attacked in Kansas, yet still I think it could not have factually been accomplished and the law does not require a vain thing.

Notwithstanding the powers and facilities possessed by the master under the order of November 26, 1941, and in aid of the investigation, no report was made by him until October 19, 1943 and no confirmation of the report was had until June 15, 1944 when the judgment was vacated and the cases set for reargument. From August, 1944 negotiations were intermittently carried on between National and Universal for the settlement of National's claim and in March, 1945 Universal asked National to be patient with respect to the matter. These negotiations finally terminated November 22, 1946 when Universal informed National that it would no longer discuss National's claim. The original complaint in this action was filed December 28, 1946.

While these matters were transpiring the Court of Appeals for the Third Circuit, on December 29, 1944, made an order providing for counsel fees and expenses to the amici curiae who had first brought the matter to the attention of the Circuit Court. This matter eventuated in a reversal by the Supreme Court, June 10, 1946 [31] and the Supreme Court intimated that the proceeding had lacked an adversary character. After several hearings and in line with the comment of the Supreme Court, the Circuit Court on June 20, 1947 set aside its order of June 15, 1944 which in turn had vacated the judgment of June 26, 1935. The entire question of venality of Judge Davis in the Circuit Court judgment of affirmance of the Root cases of June 26, 1935 was then heard before a specially constituted Court of Appeals for the Third Circuit which on July 16, 1948 filed its opinion.[32] After certiorari was refused and re-

hearing denied, the matter on March 17, 1949 was finally closed by the finding that Judge Davis had been bribed by Universal in the Root cases.

 From this long and complicated state of legal events and factual happenings I cannot say that National is estopped from seeking the rescission of its contract of April 1, 1937 which, as it contends, was at least partially based upon the contention of Universal that the affirming judgment of Judge Davis was a valid judgment.

(b) and (c) Statute of Limitations and laches.

While the defendant relies upon the alleged failure of the plaintiff to act either to rescind or discontinue the contract and the continued receipt of benefits as a substantive defense and as distinct from the defenses of Statute of Limitations and of laches, yet the several defenses have much in common and particularly with reference to the dates or times when action could or should have been taken. I have considered this action as an equitable action seeking rescission. Whether the court of equity should consider laches, qua laches, or since much of the remedy might have been available at law, the court of equity should act in analogy to the Statute of Limitations, makes, in this case, little difference.

 The time from which either limitation of time or laches should operate is material. The mere fact that fraud is involved does not prevent the running of limitation or consideration of laches, but the nature of the fraud is a matter for consideration. In most cases of rescission involving fraud, the fraud is personal to the parties and a party will be required to act when he has had or could reasonably be expected to have had knowledge of the existence of the fraud, or of such facts as would put him upon inquiry. When, however, the alleged fraud involves the integrity of a judicial officer of almost the highest court of the country, reason and authority require that a large measure of re-

31. 328 U.S. 575, 66 S.Ct. 1176.

32. 169 F.2d 514.

liance may be placed upon the presumption of probity inherent in the office and the establishment of the fraud prescribes the time from which the limitation or laches would run. I am of the opinion that when the Court of Appeals of the Third Circuit had commenced the investigation of the judicial conduct of Judge Davis, neither limitation nor laches by reason of his fraud began to run until his venality had been established by that tribunal.

The most analogous cases are the Hazel-Atlas and Shawkee cases.[33] There the fraud was perpetrated on the Patent Office and on the court; here the fraud consisted in the bribery of a member of the court itself. In the Hazel-Atlas case the original fraud was committed in 1928 and utilized upon the court in 1932. The Supreme Court,[34] after reciting the facts, said:

> "Indisputable proof of the foregoing facts was, for the first time, fully brought to light in 1941 by correspondence files, expense accounts and testimony introduced at the trial of United States v. Hartford-Empire Co., D.C., 46 F.Supp. 541, an antitrust prosecution begun December 11, 1939. On the basis of disclosures at this trial Hazel commenced the present suit."

In Shawkee Mfg. Co. v. Hartford-Empire Co.,[35] the Supreme Court considered the same fraud as in the Hazel-Atlas case and that Shawkee had some knowledge or intimations of the fraud at or prior to 1934, but said, "But at that time Shawkee had no direct proof of its charge. That proof, as pointed out in our Hazel-Atlas opinion, supra, was available only after the United States offered its evidence in the anti-trust suit in 1941." This language was adopted in Hartford-Empire Mfg. Co. v. Shawkee Mfg. Co.[36]

In the cited cases for a fraud perpetrated in 1928 and with some intima-

tions of the fraud in the meantime, the court considered the action of the injured party as in 1941 when the "indisputable proof" was established.

In the present case the actual bribery of the court itself occurred some time prior to 1937 and was utilized by the defendant in that year. In this case neither "indisputable proof" nor any proof at all of the bribery and fraud was established until the first determination by the Circuit Court in 1944 which was subsequently reopened and finally determined at a later date.

I am of the opinion that neither the Statute of Limitations nor laches is a bar to the plaintiff's suit for rescission.

(d) The defendant also denies that the plaintiff is entitled to relief by rescission because, as it contends, the plaintiff is estopped by the doctrine of unclean hands. The reasons for the application of this doctrine have been considered, but will not be here discussed at length. I do not think the doctrine estops the present action.

(e) This, then, brings me to the contention of the defendant that restoration of the status quo is a necessary element of rescission and that since this restoration of the status cannot be actually had in this case, so there can be no rescission.

There may be some distinction in the standing or stature of the principle of restoration of status between consideration of rescission at law and similar proceedings in equity. In proceedings at law the restoration of status has some relation to the right of action itself, while in equity the restoration of status is inseparably bound to the maxim that he who seeks equity must do equity. This is an equitable action. There can be no doubt of the general rule that in order to maintain an action in equity for rescission of a contract on the ground of fraud the complainant must either have restored the respondent to

33. 322 U.S. 238, 64 S.Ct. 997; 322 U.S. 271, 64 S.Ct. 1014; 3 Cir., 163 F.2d 474.

34. 322 U.S. 238, 243, 64 S.Ct. 997, 1000.

35. 322 U.S. 271, 273, 64 S.Ct. 1014.

36. 3 Cir., 163 F.2d 474, 476.

the status he formerly occupied or offer so to do.[37] This is to say that a party may not keep the benefits he has received by the contract and refuse to be bound by the disadvantages or liabilities of the contract. The plaintiff in the present case in the complaint states, "The plaintiff hereby offers and tenders to the defendant whatever return the court may find equitable, necessary and appropriate under the circumstances of this case."

In support of the general principle that rescission will only be granted upon a restoration of the status may be cited a multitude of cases. The defendant cites many of these and in particular Hegarty v. American Commonwealth Power Corp.[38] and Eastern States Petroleum Co. v. Universal Oil Products Co.[39] In the Hegarty case the Chancellor held that rescission could not be granted unless "a just and equitable restoration of the substantial status quo ante could be accomplished." It is this principle, then, that must be examined.

 In the present case I am bound by the Circuit Court's conclusion that the defendant fraudulently obtained the affirmance of the Root judgment; I have herein found that the defendant fraudulently used this affirmance as an important element in the formation and execution of the present contract now sought to be rescinded. Under that contract the present plaintiff laid out large sums of money which it now seeks to recover, and these sums were laid out, it is herein found, before the fraud had been adequately established. In return for these large sums so laid out by the plaintiff it received certain rights and benefits which may roughly be listed as (a) discontinuance of an existing infringement suit by defendant against plaintiff; (b) settlement of another suit of a third party against plaintiff; (c) use of patents and rights thereunder; and (d) a large measure of personal

services and assistance over a period of years and growing out of an elaborate organization maintained by the defendant. It is obvious that these benefits and advantages cannot be returned to the defendant so that the status quo ante shall be restored. Does this mean that equity is powerless to correct inequities brought about by fraud? I am of the opinion that in a proceeding for rescission or cancellation of an instrument on the ground of fraud, the great equitable powers of the court are not primarily framed for the protection of the one guilty of the fraud, but the primary object is to correct the injustice done to the victim of the fraud. Because, however, the court is a court of equity, it requires that he who seeks its aid must also "do equity." The court must restore the other party to its original position so far as possible and see that even the defrauded party himself derives no unconscionable advantage from the transaction.

I have heretofore found that rescission may be had in equity unless some other established principle would prevent. Any action at law conceivably might be had from two view points. The action might be merely for damages by reason of the fraud in which case the contract would remain and the fraud perpetuated. There is another proceeding at law based on what is known as "rescission in pais." There the defrauded party disaffirms the contract by treating it as already rescinded and this is necessary to invest him with the cause of action. The restoration of status is a necessary adjunct in this "rescission in pais." Between this "rescission in pais," which is merely disaffirmance by the party, and rescission in equity, which is an appeal to the conscience of a court and a rescission by the court's action, there is said to be a substantial difference.[40] The indispensable adjunct of restoration of status may be required in both cases, but in the one it

37. 3 Black on Rescission and Cancellation (2d Ed.) § 616.

38. 19 Del.Ch. 86, 163 A. 616, 619.

39. 29 Del.Ch. 305, 49 A.2d 612.

40. McCall v. Superior Ct., 1 Cal.2d 527, 36 P.2d 642, 95 A.L.R. 1019; Brown v. Norman, 65 Miss. 369, 4 So. 293.

is necessary to create the right of action while in the other it is an application of an equitable doctrine that he who seeks equity must do equity.

I am of the opinion that where the status may not be exactly restored, as where the contract concerned personal services or the like, it is peculiarly by the moulding of a decree in equity that justice may be done to the parties and consideration given to the various elements of benefit and advantages received by the plaintiff.

The question then remains, can equity grant rescission of a contract because of fraud when the advantages or benefits received by the defrauded party cannot be restored and they are not like fungible chattels, capable of being replaced by others of a similar nature.

 In 3 Black on Rescission (2d Ed.) § 618, it is said (citing cases):

" * * * If the party's failure or inability to make restitution under the contract is not his fault and not in consequence of his act or is because of his innocent act done before learning of the fraud, and justice can be done without requiring such restitution, the contract may be rescinded and the equities of the parties adjusted in the decree."

Again Black says (Vol. 3, 2d Ed., § 627):

"There are also some cases in which a return of the consideration received is impossible, as, for instance, where it consisted in services rendered * * * and here it is sufficient to tender the reasonable price or value."

So in 5 Williston on Contracts (Rev. Ed.) § 1530, pp. 4292–4293, it is said:

"That a party seeking rescission of a contract must return, or offer to return, what he has received under it, and thus put the other party as nearly as is possible in his situation before the contract, is the law. But this rule is wholly an equitable one; impossible or unreasonable things, which do not tend to accomplish

equity in the particular transaction, are not required."

And again, on pages 4293–4294:

"Where circumstances permit, some courts also have allowed as a substitute for restoration of the consideration a deduction of the amount of it from the recovery against the wrongdoer. This is the most satisfactory disposition of many cases."

 In Restatement of the Law (Restitution, § 66), in discussing the question where specific restoration is required, it is said:

"If specific restoration became impossible before the party seeking restitution knew the facts and had an opportunity to act thereon, restitution is granted upon the payment of value or the imposition of conditions if justice cannot otherwise be done, * * *."

In the comment on the section it is said:

"Where services have been received by the party seeking restitution or where he has utilized a privilege granted by the other, as in the case where a patent has been used, it is impossible to restore in specie what has been received * * *. In such cases the fact that there cannot be restoration in specie does not ordinarily prevent restitution; it is only where the other party has not been guilty of fault or where he cannot be put back in substantially the position which he previously occupied or where there is serious difficulty in estimating the amount which should be paid by the transferror that restitution will be denied * * *."

The foregoing provisions, I think, are applicable to this case for rescission of the contract on the ground of fraud.

 In support of the foregoing principles might be cited a myriad of cases. I am of the opinion that rescission on the ground of fraud will not be denied because the exact benefits and advantages received by the defrauded party

cannot, by reason of their nature, be restored, but the equities of the matter and justice to the parties will be moulded by the decree.

It becomes material, then, to consider to what extent the plaintiff contends it has been damaged by the fraud of the defendant and the various items constituting such claim. The plaintiff itemizes a number of pecuniary claims which, with interest, amount to $1,614,708.99. To this the plaintiff adds a claim for exemplary damages which, by some claimed analogy to treble damages under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, it fixes at three times the pecuniary damage.

The items to be considered are:

(a) The royalty payments made by the plaintiff under the terms of the contract.

(b) So-called "supplementary damages" consisting of costs and expenses in connection with various matters of litigation (most of which was not directly laid out or paid by the plaintiff itself).

(c) Exemplary damages.

These claims will be considered in their reverse order.

(c) Exemplary damages. This is an equitable action which I have herein concluded was brought for rescission of a contract partly, at least, induced by fraudulently pleading as res judicata a decision which in itself had been obtained by fraud.

■■■■■ I have concluded that the plaintiff's rights do not stem from the original fraud in the Root case to which the plaintiff was not a party, but from the fraudulent use of that fraudulently-obtained judgment directly against the plaintiff as res judicata and in an action to which the plaintiff was a party. No matter how heinous the original fraud may have been, the plaintiff acquired no rights as a public vindicator or avenger of the original fraud. This, then, being an equitable action for rescission, I believe the law to be uniform that in the absence of express statutory provisions, a court of equity is without authority to assess exemplary or punitive damages.[41] I think, then, that exemplary damages are not to be considered by me in connection with any decree.

(b) "Supplementary" damages claimed by the plaintiff.

In addition to the repayment of the royalties which the plaintiff contends it paid by reason of the fraudulent use, as res judicata, in the Kansas case of the fraudulently obtained judgment of affirmance in the Root case, the plaintiff also claims a large amount as "supplementary" damages. The plaintiff for some time previously to the making of the contract had been a contributor to the Winkler-Koch Patent Company as the operator for a so-called Winkler-Koch defense fund raised for the purpose of defending users of the Winkler-Koch process and had contributed to this fund some $87,000. Those persons operating this defense fund, viz., the Patent Company, expended a large sum in preparation of litigation in which the plaintiff was interested and these payments the plaintiff claims to be entitled to recover. The supplementary damages may be divided into several categories.

(b) (1) The Winkler-Koch Patent Company for the Winkler-Koch group of users expended some $74,000 in defense of two suits brought by Universal against National, viz., one in Ohio and one in Kansas as follows:

(b) (1) (a) $4,000 in defense of the Ohio suit prior to 1935.

(b) (1) (b) Some $60,000 was expended by Winkler-Koch Patent Co. in defense of the Kansas suit prior to the interposition of the plea of res judicata in that case.

(b) (1) (c) $10,000 expended by Winkler-Koch Patent Co. in defense of the Kansas suit after the interposition of the plea of res judicata.

41. Coca-Cola Co. v. Dixie-Cola Laboratories, 4 Cir., 155 F.2d 59, certiorari denied 329 U.S. 773, 67 S.Ct. 192, 91 L.Ed. 665; Taylor v. Ford Motor Co., D.C., 2 F.2d 473; U. S. v. Bernard, 9 Cir., 202 F. 728.

(b) (2) The plaintiff seeks also to recover the amount of $5,955 expended by it in connection with the Ohio suit and the Kansas suit prior to the interposition of the plea of res judicata.

(b) (3) The plaintiff seeks also to recover the amount of $5,000 out of pocket expense with reference to the Ohio case prior to the interposition of res judicata.

(b) (4) The plaintiff seeks also to recover the amount of $2,500 expended by it directly in the Kansas case after the interposition of the plea of res judicata in that case.

(b) (1) (a) and (b) (1) (b) The defendant objects to these allowances on two grounds: (1) that these payments were not made by National, but by Winkler-Koch Patent Co.; that no sums were advanced by National for any specific defense against Universal and would have been paid by National to Winkler-Koch Patent Co. even if suits involving Winkler-Koch process had been instituted by others and not by Universal and that there is no shown connection between the contributions of National and the present defendant.

▆ This matter and involving the same parties, inter alia, was considered in Skelly Oil Co. v. Universal Oil Products Co., 338 Ill.App. 79, 86 N.E.2d 875. There it was held that the mere fact that payments were made by the Patent Co. and not by the operating company charged with infringement was not material, but that each operating company could only recover the money necessarily expended in defense of the action to which it was a party. With this I am in accord.

▆ Secondly, it is objected that the amounts were expended by Winkler-Koch Patent Co. some time prior to the use by Universal of the corruptly-obtained judgment in the Root case as res judicata in the Kansas case. I am of the opinion that the claims in this category cannot be considered by me. I have herein held that any right of National did not stem from the original fraud in the Root case, to which it was not a party, but originated in the fraudulent use of that fraudulently-obtained judgment as res judicata in the Kansas case. In other words, I am of the opinion that if Universal had made no use in 1937 of the fraudulent judgment in the Root case as against the present plaintiff, no rights of the present plaintiff with reference thereto and as claimed in this case would have arisen and no supplementary damages can be considered by me which arose or were effective prior to that time.

In the Skelly Oil case, supra, the court did not consider the time of the payments as affected by the pleading of res judicata as the origin of the cause of action. When, however, the matter was returned by mandate to the Circuit Court of Cook County, Ill., Judge Fisher, on October 19, 1950, held that such expenses were confined to the period after the interposition of the plea of res judicata.

With this conclusion I agree and may not include expenses prior to that date.

▆ (b) (1) (c) This payment of $10,000 seems to have been made by the Patent Co. in defense of the Kansas suit after the plea of res judicata. As such it falls in the consideration just made and must be considered in any decree to be made by me.

(b) (2) and (b) (3) are subject to the considerations and objections just considered.

(b) (4) This sub-division concerns the sum of $2,500 directly laid out by the plaintiff itself, and subsequent to the interposition of the plea of res judicata in the Kansas case. It was clearly an expenditure made by the plaintiff with reference to the plea of res judicata and must be considered by me in connection with other expenditures made by reason of the fraudulent use of that plea.

(a) Royalty payments made by the plaintiff pursuant to the contract sought to be rescinded.

▆ The plaintiff after the making of the contract and between May 25, 1937 and June 12, 1944 made payments of royalties pursuant to the terms of the

contract and in the amount of $821,505.-66. The contract is sought to be rescinded on the ground of fraud. I have herein found that the defendant fraudulently made use of a fraudulently-obtained judgment as res judicata and that this fraud was, at least partly, responsible for the making of the contract. In any rescission of the contract, then, the royalties paid pursuant to the contract must be considered in any decree to be entered. The matter of interest on the royalty payments will be subsequently considered.

The defendant does, and always has, denied any wrongdoing of any kind. I have felt estopped from any consideration of the original fraud in the Root case. The defendant denies that the interposition of the plea of res judicata of the Root case in the Kansas case was any determining element entering into the execution of the contract, but that the plaintiff entered into the contract solely for the benefits it was to receive and, as contended, did receive, under the contract.

The defendant has contended that no rescission of the contract is permissible because the status quo ante may not be restored and that the advantages and benefits the plaintiff has received under the contract should not be retained by it. A consideration of the benefits and advantages received and enjoyed by the plaintiff must then be considered and evaluated.

Preliminarily, I must advert to the contention of the plaintiff that the defendant, under the present circumstances, is not entitled to any set-off, counterclaim, return of benefits or advantages obtained by plaintiff or entitled to any purported equity ordinarily accruing to a party in a rescission case. Except for the insistence with which the claim is made, the suggestion would not be unduly explored. The plaintiff contends that its rights and the disabilities of the defendant originate in the original bribery of Judge Davis in the Circuit Court; that since that bribery struck so vitally at all principles of law, government and morals, no rights of the party responsible for the bribery and fraud can be recognized. Commencing with a somewhat general and highly ethical view of the relationship of individuals with public offices as pronounced in Trist v. Child [42] and continued in the cases cited in the footnote,[43] the plaintiff relies upon Pan-American Petroleum & Transport Co. v. United States, 273 U.S. 456, 47 S.Ct. 416, 71 L. Ed. 734, to show that Universal, the defendant, is not entitled to any consideration in the present case.

Agreeing with the plaintiff in the extreme character of a fraud involving the corruption and bribery of a judge in a case then pending before him, I still must remember that as a court of equity I must insist that equity, insofar as possible, be done. I have heretofore pointed out that the plaintiff is here neither the avenger nor protector of public rights but a seeker after redress for a private wrong; that its rights do not spring from the corruption of the official but from a subsequent and substantive use of a fraudulently acquired judgment. Finally, I must express the view that the Pan-American case does not, in my opinion, hold the views for which it is cited.

In the Pan-American case it was found that the United States had been defrauded and the Pan-American Companies had wrongfully received certain oil leases and rights by virtue of that fraud. The District Court [44] set aside the leases and contracts on the ground of fraud, but held that the defrauding party was entitled to some credit for the benefits it had bestowed pursuant to the contract. The Circuit Court [45] affirmed

---

42. 21 Wall. 441, 88 U.S. 441, 22 L.Ed. 623.

43. Oscanyan v. Arms Co., 103 U.S. 261, 26 L.Ed. 539; Gesellschaft Fur Drahtlose Telegraphie M. B. H. v. Brown, 64 App.

D.C. 357, 78 F.2d 410, certiorari denied 296 U.S. 618, 56 S.Ct. 139, 80 L.Ed. 439.

44. 6 F.2d 43.

45. 9 F.2d 761.

as to the cancellation of the contracts and leases and reversed as to the allowance of any credit for expenditures made by the defrauding party. The Supreme Court [46] affirmed the Circuit Court. In my opinion the Supreme Court plainly held that its refusal to allow any credit for expenditures made by the defrauding party was due to the nature and effect of the fraud there found. In the cited case the fraud involved the direct frustration and violation of the public policy declared by Congress. The allowance of the credits and expenditures would have had the effect of foisting upon the Government certain structures and installations which were contrary to the public policy established by proper authority, and ascribing any value to the installations would have entirely changed the expressed public policy. The Pan-American case, in my opinion, is a direct authority for the action of this court in the present case. It distinctly holds that in a rescission case he who seeks equity must do equity, and that as the transaction ought never to have taken place, the parties are to be placed, as far as possible, in the situation in which they would have stood if there had never been any such transaction and that such principles would apply even in an ordinary contract to which the Government is a party. The case precisely stated:

"* * * While the perpetrator of the fraud has no standing to rescind, he is not regarded as an outlaw; and, if the transaction is rescinded by one who has the right to do so, 'the courts will endeavor to do substantial justice so far as is consistent with adherence to law.'"

 I am, therefore, of the opinion that the doctrine of the Pan-American case does not prevent a consideration of the benefits and advantages received by the plaintiff by reason of the contract, nor prevent those benefits and advantages from being considered in connection with any restoration of status required by the law of rescission.

The defendant contends that by virtue of the contract of April 1, 1937 the plaintiff received great benefits, profits and advantages and that it would be inequitable and unconscionable for the plaintiff to retain all the benefits and advantages of the contract and be relieved of its obligations and burdens. That would be equivalent to a rescission of the contract in part and an affirmance in part and this all the authorities agree may not be done. Of such opinion is this court.

The defendant generally lists the advantages and benefits accruing to the plaintiff by virtue of the contract under several categories which must be separately but briefly considered and evaluated as none of these benefits was or could be restored, in specie, as it were. The defendant says that the plaintiff benefitted:

(a) From the discontinuance by the defendant of an existing infringement suit against the plaintiff whereby the plaintiff was absolved from damages for any supposed infringement.

(b) From the settlement at the expense of the defendant of other infringement suits against the present plaintiff, such suits having been instituted by third parties.

(c) From the free, non-exclusive and non-assignable license to use the processes under a very large number of patents, some 456 of which were specifically mentioned in the agreement and some six or seven of which were discussed in extenso at the trial.

(d) From a very large measure of personal services and assistance over a period of years from April 1, 1937 and growing out of an elaborate organization maintained by defendant and the needs of the plaintiff.

(a) By the terms of the contract of April 1, 1937, both South Dakota and Universal agreed to "dismiss their respective suits presently pending in the United States District Court for the District of Kansas, Third Division." These

---

46. Pan-American Petroleum & Transport Co. v. United States, 273 U.S. 456, 47 S.Ct. 416, 424.

suits, pursuant to the agreement, were promptly dismissed after execution of the contract. Their dismissal was, of course, beneficial to National and they cannot be reinstated or restored. It may be difficult to assign precise monetary value to the dismissals and the exoneration of National, but they must be kept in mind in the equitable consideration subsequently established.

(b) The agreement of April 1, 1937 contained explicit provisions binding Universal to hold National harmless from litigation instituted by others arising from the use of the licensed processes. At the time of the contract there was an existing suit of Gasoline Products Co. against National in the Northern District of Ohio, Western Division. By express provision of the contract the indemnity provision included therein was made to cover this suit. This action was subsequently dismissed at the instigation of Universal. After the making of the contract between the present parties, an action was instituted by the Texas Co. against National for infringement. National, according to the terms of the contract, expressly called upon Universal to assume responsibility of defense. The action was eventually arranged between Texas and Universal as one element of an elaborate settlement involving many complicated features whereby Universal paid to Texas over a million dollars in cash and two and a half million in income notes. No exact amount of this settlement can be allocated to the specific action of Texas against National, but like the dismissals of Universal's own actions against National, that benefits and advantages accrued to National can scarcely admit a doubt. Some indication of the value of the indemnity provision may be found in the fact that National had been a subscriber to a defense fund operated by Winkler-Koch Patent Co. for Winkler-Koch users and during the appropriate years National had contributed thereto some $193,000 for indemnity or protection against suits for infringement.

(c) Under the contract of April 1, 1937 National had the free right to use and enjoy any patents which Universal then had or might afterward acquire or as to which Universal had the right to license. At the time of the contract Universal owned or had the power to license some 1700 patents, 456 of which were set out, eo nomine, in the contract. To avoid the task of considering all the patents, six or seven were processed in this case and these the defendant claims as typical. The plaintiff denies those patents as "typical", but contends they are the only ones worthy of discussion.

Before considering any of the patents, their teachings or the value to National of their use, I must consider a basic and fundamental objection of the plaintiff to the consideration of any of them. The plaintiff seeks to apply the so-called Keystone Driller doctrine and contends the defendant does not come into court with clean hands as to any of the patents and may not rely upon them for any purpose. The doctrine sought to be applied is that of Keystone Driller Co. v. General Excavater Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. The doctrine of that case as tersely and perhaps inadequately stated is this: Where a party has been guilty of fraud in the procuring of a broad patent and subsequently seeks to make use of that patent in connection with litigation concerning another or improvement or related patent directly connected with the tainted patent and having important or essential elements in common, then the party does not come into court with clean hands as to the improvement or related patents. The court recognized that the doctrine of unclean hands is not of general or unlimited application, but is only available when the tainted transaction has an immediate and necessary relationship to the equity involved in the pending matter. The ordinary application of the doctrine of clean hands has been followed in this court in Buromin Co. v. National Aluminate Corp., D.C., 70 F.Supp. 214.

The plaintiff reasons thus: that the defendant's Dubbs patent 1,392,629 was a basic patent and the other patents here involved are modifications or improve-

ments; that the Dubbs '629 patent was the identical patent involved in the Root case as to which it has been held that the Circuit Court affirmance was corruptly obtained; therefore, the plaintiff contends, under the Keystone Driller case, the defendant does not come into court with clean hands as to the other patents. A present application of the Keystone Driller case to the instant case presents an amazing anomaly of an exact change of position by both parties. It is obvious that for the doctrine to apply it must be considered that the Dubbs patent '629, to use the words of the plaintiff's brief, by its claims "covers broadly the generic and very widely used clean circulation process regardless of whether the phase of the oil in the coil was liquid or mixed." Such, in effect, was the opinion of this Circuit in the opinion by Judge Davis, held to be corruptly obtained and reported in 78 F.2d 991. In the 7th Circuit a similar question with reference to the identical patent was raised in Universal Oil Products Co. v. Globe Oil & Refining Co.[47] There the District Court and Circuit Court distinguished between a liquid phase cracking and a liquid vapor or mixed phase process. They limited the Dubbs patent '629 to a process where the generation of vapors was avoided in the cracking tubes and thus held Dubbs '629 as a narrow species invention. With this conflict between the Circuits, the Supreme Court granted certiorari in the 7th Circuit case which it had denied in the Root case. The Supreme Court [48] sustained the 7th Circuit and the character of Dubbs '629 as a narrow patent is fixed. Here, then, is the curious transposition of views. While it may be true that both the Dubbs patent '629 and the patents here considered have certain elements in common, yet the present patents either differ from the Dubbs patent '629 or more directly conform to it, depending on which construction of Dubbs '629 you adopt, viz., that of the 3rd Circuit, 78 F.2d 991, or the entirely different view of the Supreme Court, 322 U.S. 471, 64 S.Ct. 110. While the Dubbs patent '629 did cover a process of raising the temperature of the oil in the coil "without substantial vaporization", yet the 3rd Circuit so construed "vaporization" as to make the patent apply to a liquid vapor or mixed phase cracking process. On the other hand, the District and Circuit Courts of the 7th Circuit and the Supreme Court construed the Dubbs patent '629 as confined to a liquid phase and did not cover a liquid vapor or mixed phase cracking process in the cracking coil. The patents here processed seem to involve, as it was originally thought the Dubbs '629 involved, liquid vapor or mixed phase cracking which, it has now been determined by the Supreme Court, were not covered by Dubbs '629. The users of the Winkler-Koch process, including National, always insisted upon the narrow construction of Dubbs '629 as held by the Supreme Court and that the Root case was improperly decided. To make the Keystone Driller case applicable, this erroneous decision in the 3rd Circuit must be accepted in order to make the present patents refer to the same matter as the tainted patent.

The defendant is in like position or transposition. The defendant originally contended in the Root case for the broad construction of Dubbs '629 and it has been held that the defendant, in order to insure the adoption of its construction, fraudulently induced the affirmance of the Root case. The defendant must contend now that the affirmance it bought and paid for was erroneous and did not refer to the same subject matter as the patents here involved.

I am of the opinion that Dubbs patent '629 as construed by the Supreme Court is a statement of what the claims of that patent set out and that the patent was so limited at all stages of its existence from its original grant and no matter if it had been erroneously or corruptly determined otherwise. In applying the Keystone Driller case I must con-

47. D.C., 40 F.Supp. 575, affirmed 137 F. 2d 3.

48. 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399.

sider the Dubbs patent '629 as it always had existed even though the correct interpretation was afterwards given.

■ I think the doctrine of the Keystone Driller case does not prevent a consideration of the processed patents as having been available or utilized by the plaintiff, nor prevent the defendant from requiring the plaintiff to account for the right to use such patents in connection with the rescission of the contract of April 1, 1937.

At this time and while considering the question of the patents of the defendant in connection with the agreement of April 1, 1937 and its rescission, it seems appropriate to consider briefly two contentions of the defendant, viz.: (1) that the right of the present plaintiff under the agreement to use all of the patents of the defendant, as contrasted with the actual or proven use, is a proper consideration, inter alia, for the payment of royalties; and (2) that the plaintiff is estopped to contest the validity of the defendant's patents. For the support of both questions the defendant cites Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312. The matters must be separately considered for the cited authority seems to have more binding effect in the first instance than in the second.

1. In the Hazeltine case[49] there were some 570 patents and numerous applications involved. In the District Court it was shown that some of the patents had been invalidated and it was held that the right to use all of the patents rather than the actual use of a particular patent was the basis of the contract. Of such view was the Circuit Court and the Supreme Court, where it is said, "Payment for the privilege [of use] is required regardless of use of the patents."[50]

■ In the present case it appears that the defendant owned or had the authority to license some 1700 patents. Some 456 were expressly set out in the contract. Presumably one of the parties, at least, thought the right to their use was of sufficient importance to set them out expressly. The right to use those patents and to be protected in such use was unlimited. The actual use as distinguished from the right to use was, under the Hazeltine case, immaterial. So it must be deemed in this case.

2. The defendant also contends that the plaintiff is estopped from denying the validity of the patents which, under the license, the plaintiff had the right to use. Under the license it is expressly provided that in any infringement suit the present plaintiff was estopped from contesting the validity of the patents. In support of its claim of estoppel the defendant cites the Hazeltine case, supra, and Hall Laboratories, Inc. v. National Aluminate Corp., D.C., 95 F.Supp. 323. Those cases support the principle that a licensee may not attack the validity of the licensed patents, but the plaintiff distinguishes the cases upon the ground that the cited cases concerned actions pertaining to royalties but have no application to an action for rescission such as this. As the plaintiff phrases it, "If the agreement is in force, National [the present plaintiff] is estopped; if the agreement is rescinded, there is no estoppel. The thing is that simple."

■ I do not think the matter quite as simple as indicated. It may be unnecessary to exactly determine whether the principle of the Hazeltine case is precisely applicable to a rescission case, but the facts of this case, with the equitable relief sought, must be considered. This is a bill for rescission of a voidable contract. Under the contract a very large sum of money (over $800,000) was paid over a period of seven years. These

49. District Court, 77 F.Supp. 493; Circuit Court, 1 Cir., 176 F.2d 799; Supreme Court, 339 U.S. 827, 70 S.Ct. 894, 897.

50. See also Eastern States Petroleum Co. v. Universal Oil Products Co., 29 Del. Ch. 305, 49 A.2d 612.

sums were paid after the date of the contract and are sought to be recovered in this action. The sums were paid in consideration (inter alia) of the use of a large number of patents. Some 456 of these patents, including those directly processed and considered in this action, were set out eo nomine in the contract. The contract expressly provided that in any infringement suit the present plaintiff would not contest the validity of any patent so named. To be sure, this is not an infringement suit and no such suit, by reason of limitation, can now be brought. This is an action to rescind the contract, but it seeks to recover all that the plaintiff paid during the seven years after the date of the contract and at the same time to deny to the defendant any benefit for the advantages the plaintiff received. If rescission of the contract in the present case be denied, the present plaintiff would be estopped from contesting the validity of the patents. During the seven years from 1937 (date of the contract) to 1944, during which the plaintiff paid royalties which it now seeks to recover, the present plaintiff could not dispute the validity of the patents. To me it seems inequitable to allow the plaintiff to recover the royalties paid and not be required to make any account of the privilege of using the stipulated patents or be allowed now to attack their validity. I therefore think the plaintiff is estopped from questioning the validity of the patents of which, for so long a time, it had the free use, and as to which it was specially barred from attacking the validity.

It may be true that it may be difficult to assign a precise monetary value to the permitted use of the patents, the validity of which could not be attacked by the plaintiff, but the fact of such permitted use is a factor to be kept in mind in the final adjustment.

(d) I now come to a consideration of the mass of divergent testimony concerning the services rendered to the plaintiff by the defendant through all the years the contract was in force. Before considering the nature of the services even in limited detail, it is first necessary to consider the objections of the plaintiff as to their consideration at all. The plaintiff contends, first, that because of the enormity of the fraud practiced by the defendant, viz., the corruption of a judge in the performance of his duty, the defendant is not entitled to any accounting for the services rendered. It contends, secondly, that the services were voluntarily given and were not required by the contract between the parties and that the plaintiff owes nothing for them, and, third, that the value of the services was comparatively small and must be gauged by the cost of the services to the defendant.

■ (1) As to the first objection, I have heretofore found that the rescission of the contract which the plaintiff seeks was not based upon the original bribery by the defendant of Judge Davis in a case to which the plaintiff was not a party, but in the use of that fraudulently-obtained judgment as a valid judgment in an action by the defendant against the plaintiff when the defendant knew the former judgment was corruptly obtained, but the plaintiff had no such knowledge. The plaintiff, by the present action for rescission of the contract, partly impelled by the use of the fraudulent judgment, seeks the relief of equity. It must then do equity. The services can neither be returned nor restored. Their value must, therefore, be considered for otherwise their receipt and retention by the plaintiff would result in the inequitable and unjust enrichment of the plaintiff at the expense of the defendant.[51]

■ (2) As to the second contention, it is sufficient to state that all of the officers of both the plaintiff and the defendant assumed and agreed that after the making of the contract the plaintiff,

---

51. Walker v. Galt, 5 Cir., 171 F.2d 613, 615, 6 A.L.R.2d 808, certiorari denied 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1086.

like all other licensees of the defendant, was entitled to the services of the defendant. Not only was it assumed that the plaintiff would be entitled to the services arising from the elaborate organization of the defendant, but acting upon that assumption, the services were rendered by the defendant and received and utilized by the plaintiff.

■ (3) If it be correct to say that in any rescission to be granted there must be taken into account the value of the services rendered to the plaintiff by the defendant, and if the reason therefor be that the retention of the value of those services would inequitably enrich the plaintiff, then it seems clear that the amount to be considered is the value of the services, and not the actual cost of the services incurred by the defendant in their rendition.

The services rendered by the defendant to the plaintiff and utilized by the plaintiff to its profit and advantage are set out at great length and cover many thousand pages of testimony. One hypothetical question dealing with these services covers 85 pages. It is impossible to treat these services in detail. Any attempt to minutely consider the elaborate testimony of the defendant and the opposing testimony of the plaintiff would extend this opinion beyond any proper limits.

The services may generally be grouped in four categories:

a. Inspections of the thermal cracking units of the plaintiff.

b. Engineering services rendered in connection with the plants of the plaintiff.

c. Suggested changes in operation leading to increased production by the plaintiff and greater profit.

d. Use of the laboratory and facilities maintained by defendant.

It has been testified that the services rendered by the defendant could not have been duplicated from any other source. It is not necessary for me to attribute to the defendant such an outstanding position. It is clear that the defendant had an elaborate organization. It had a corps of over 500 persons highly skilled and trained in the field of development and marketing of petroleum products which, by experimentation and practice, kept abreast of the development of the science. As compared with the facilities of the plaintiff, the staff of the defendant seems outstanding. The services of the defendant must be considered in any adjustment between the parties.

I now come to an attempt to adjust the equities of the case. I have heretofore held that the defendant made use of a fraudulently-obtained judgment as, at least, an additional reason for the present plaintiff to take a license from the defendant and become obligated to pay royalties. I have heretofore held that the contract thus made was a voidable one and that the plaintiff was entitled to rescission upon doing such equity as was possible and returning the defendant, so far as possible, to the status quo ante. The great benefits the plaintiff has received from the defendant consisted, as heretofore shown, in indemnity proceedings protecting the plaintiff from a suit already brought and one brought subsequently; the free use of a great number of patents; and a very large measure of personal service and assistance. None of these benefits can be restored, but they have all proved to be greatly beneficial to the plaintiff. The retention of these benefits by the plaintiff without compensation to the defendant results in the inequitable enrichment of the plaintiff. It is necessary, therefore, to attempt to accord to the services rendered and benefits conferred by the defendant to the plaintiff some measure of valuation.

■■ It is quite impossible to accord to each of the several species of benefits received by the plaintiff an exact monetary value, nor does it seem necessary to do so. When the various services and benefits were rendered by the defendant, such defendant knew they were to be rendered, but no amount or

consideration was allocated to any particular type of service or benefit. When the plaintiff accepted the license or contract under which the services and benefits were to be rendered, the same course was followed. Both parties consolidated all the benefits and advantages to be rendered and received into one "package," as it were, and for one amount designated as "royalty" agreed respectively to render the services and to receive and pay for the same. Not only were these amounts agreed to by these parties but, insofar as the defendant is concerned, they were the same royalties or compensation paid by all other licensees from the defendant and as indicative of their value. At the time the services were rendered and benefits conferred by the defendant to the plaintiff, the defendant was not a charitable organization but its main business activities consisted in rendering such services to others desiring the same and to obtain an adequate profit to itself. By reason of the fraud practiced by the defendant this profit cannot be allowed to be retained, but by a court of equity the parties must be restored as nearly as possible to that situation they formerly occupied.

▆▆▆ It matters not whether the exact computation of the value of the services and benefits rendered by the defendant to the plaintiff be considered with respect to the defendant's counterclaim, or whether it be considered as a restoration which the plaintiff must make in order to be entitled to rescission. They both spring from the principle that the defendant must disgorge any profits it has made and that the plaintiff may not be inequitably enriched. The plaintiff may not retain the benefits of the contract and be relieved of its liabilities.

The computation of the value of the services and benefits rendered by the defendant to the plaintiff and which must be allowed to the defendant bears a strong analogy to what in other branches of the law would be known as "quantum meruit." The difference applicable to this case lies in the fact that I am of the opinion that the parties themselves have, in a measure, fixed the value of the services. During all the years the contract was in force and during which time the royalties were paid and the services rendered by the defendant and enjoyed by the plaintiff, both parties recognized that the amount paid as royalties paid for all the services rendered and benefits received, together with an adequate profit to the defendant.

In this case and by the testimony the defendant seeks to place a valuation on the services and benefits rendered by it to the plaintiff in an amount far exceeding the contractual royalties which entitled the plaintiff to such services and benefits. In those cases where the defrauded party had rendered services and sought recovery for their value, recovery has been usually allowed, even though the value of the services exceeded the contract price. This is upon the theory that the contract being rescinded because of fraud, the innocent party is restored to his original position.[52] Even in such situations the law is not uniform and in some cases the value of the services is tested by the contract provisions. Such seems to be the law in Illinois.[53]

No case has been found where the party committing the fraud and seeking the value of his services in equity has been allowed a greater value for the services than he, himself, by contract had stipulated. As herein pointed out the royalties paying for the services were the same amounts charged other licensees of the defendant and included such a measure of profit as would enable the defendant to defray the cost of the elaborate organization contended for by the defendant.

The only uncertain factor in this computation is the percentage of profit

52. 5 Williston on Contracts (Rev.Ed.) § 1459.

53. Keeler v. Clifford, 165 Ill. 544, 46 N.E. 248; Rice v. Partello, 88 Ill.App. 52.

to the defendant which, being deducted from the royalty paid, would lead to the evaluation of the services. This percentage of profit in the adjustment to be made I have fixed at 25%. This amount, concededly, is an arbitrary fixation and the court tenders itself prepared to accept, before final order, a modification of that figure by agreement of the parties, or to cause its ascertainment with greater exactitude by reference to a master at the expense of the party so applying.

Before applying these principles to the available figures I must give some attention to the fact that the plaintiff ceased paying royalties after June, 1944. The contract at that time was in force and the plaintiff had taken no steps for its rescission, notwithstanding the fact that the fraud of the defendant in the corruption of Judge Davis had been then exposed and the utilization of that fraud has been found to be, at least partly, the basis for the 1937 contract between the parties. The amount of the royalties retained by the plaintiff and not paid to the defendant amounted to $53,194.15. The services and benefits, upon which this amount of royalties was based, had been rendered by the defendant and received by the plaintiff. If these retained royalties had, in fact, been paid by the plaintiff they would, in this consideration, have been added to and would have augmented the other royalties paid, and I see no reason why the principles heretofore adopted should not be applied, mutatis mutandis, to these unpaid royalties.

Applying the principles hereinbefore discussed to the concrete facts, we find:

The plaintiff paid to the defendant as royalties: $821,505.66

The plaintiff expended in defense of the Kansas suit after the interposition of the plea of res judicata: 2,500.00

The plaintiff paid to Winkler-Koch Patent Co. and Winkler-Koch Co. expended in defense of the Kansas suit against plaintiff and after the plea of res judicata: 10,000.00

Payments by plaintiff to be herein given consideration: $834,005.66

Value of the services rendered by the defendant and other benefits received by plaintiff to be returned in restoring the status quo ante ($821,505.66 less 25%): $616,129.25

Value of the services rendered by the defendant for which the plaintiff did not pay royalties ($53,194.15 less 25%): 39,895.61

Value of services rendered and benefits conferred by defendant to plaintiff: $656,024.86 $656,024.86

Excess of payments by plaintiff constituting the award: $177,980.80

I must now direct my attention to the question of allowance of interest on the award to the plaintiff.

While the allowance of ante-judgment interest is in some dispute, yet its allowance is very generally accorded and this is true in cases based on fraud. The date from which interest is to be computed is not always clear. I take it to be a general principle that, in the absence of any agreement, interest should run from the time the sum upon which the interest is to be computed has become due and payable or should by construction of law have been due and payable. This may be another way of saying that interest should be computed from the accrual of the cause of action for the sum on which interest is to be computed.

In many cases involving fraud the computation of interest and the fixation of the time from which interest should run depends upon the nature of the action and the standing of the parties. Thus in an action at law for deceit interest is generally allowed from the time the payments, induced by fraud, were made. The cases generally are collected in an annotation in 171 A.L.R. 816 et seq.

This is an action for rescission of a contract. It must be borne in mind that the contract between the parties was voidable and not void. If the plaintiff had conceived or continued to conceive the contract as beneficial to

it, it could have kept the contract in force and have continued to receive the benefits of such contract, even though the contract had originated in the fraud of the defendant. A voidable contract, when sought to be made void by rescission, is subject to that disposition at the time the defrauded party takes such action. That is the time, it seems to me, the cause of action accrues and any amounts theretofore paid would become due and payable.[54]

I have heretofore found that the law of Illinois, by agreement of the parties and upon other considerations, is to be applied in this case. With reference to the allowance of interest in cases of rescission of a contract on the ground of fraud the Supreme Court of Illinois has spoken with unusual particularity. In Felt v. Bell, 1903, 205 Ill. 213, 68 N.E. 794, 800, the court, in speaking of the action, said, "It is a suit to rescind on the ground of fraud. * * * We are of opinion [plaintiff] should recover interest from the date of filing his bill in this cause * * * which was the time of the actual rescission of said contract by him. The decree * * * will therefore be modified to include interest at the rate of 5 per cent * * * from [the date of filing suit]." [55]

 This is the latest pronouncement of the Illinois courts of which I have knowledge, and 5 per cent seems to be the legal rate of interest in Illinois. To the award heretofore indicated, therefore, there should be added interest at the rate of 5 per cent from the 28th day of December, 1946, the date of the plaintiff's legal step seeking the rescission of the contract of April 1, 1937.

In the absence of any further application for the reascertainment of the amount of the decree, such decree should be for $245,168.55. This amount is the sum of $177,980.80, together with interest thereon at 5% from December 28,

1946 to the date of this opinion, viz., July 16, 1954. Any extended delay in the presentation of an order will, of course, affect the computation of interest.

---

54. See Hayt v. Bentel, 164 Cal. 680, 130 P. 432; Shirreffs v. Alta Canyada Corp., 8 Cal.App.2d 742, 48 P.2d 55.

55. See, however, Warren v. Tyler, 1875, 81 Ill. 15, and cases collected in the annotation in 171 A.L.R. 816–866.